

# NUMBER 13-05-680-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

INSURANCE NETWORK OF TEXAS,                                    Appellant,

v.

HARVEY & DIANA KLOESEL, ET AL.,                                    Appellees.

## On appeal from the 2nd 25th District Court of Lavaca County, Texas.

# O P I N I O N

### Before Justices Yañez, Rodriguez, and Garza
### Opinion by Justice Yañez

Harvey and Diana Kloesel, individually and d/b/a Kloesels' Steakhouse, Inc. ("the Kloesels"), sued appellant, Insurance Network of Texas ("INT"), for breach of contract, negligence, and violations of the Texas Insurance Code and the Texas Deceptive Trade Practices Act ("DTPA"). A jury found that INT acted negligently and violated the DTPA, causing the Kloesels' damages. INT subsequently appealed the trial court's amended final

judgment and the Kloesels cross-appealed. We affirm the trial court's judgment as written.

## I. BACKGROUND

### A. Pretrial Background

Harvey and Diana Kloesel are married. They have owned and operated Kloesels' Steakhouse in Moulton, Texas since 1970. INT is an independent insurance agency. In 1993, the Kloesels wanted a different insurance company to safeguard their restaurant. The Kloesels approached Gary Nitsche, an insurance agent with INT, to discuss having INT procure insurance for their restaurant.[1] When INT first procured a policy for the Kloesels, it obtained the policy from Providence Washington Insurance Company ("Providence"), an admitted carrier, for the 1993–1994 policy year. The Providence policy covered communicable disease claims. During that policy year, the Kloesels expressed their intent to add a horse-and-carriage operation to their restaurant. As a result, Providence opted not to renew the Kloesels' policy, which was set to expire in October 1994. INT notified the Kloesels of the need to change carriers and subsequently procured for them a general liability policy from Burlington Insurance Company ("Burlington"), a surplus lines carrier, for the 1994–1995 policy year. The Burlington policy covered claims arising from the horse-and-carriage operation, which began in November 1994, but excluded communicable disease claims. The Kloesels paid the premiums for this policy and renewed it for the 1995–1996, 1996–1997, and 1997–1998 policy years.

During the 1997–1998 policy year, over ninety customers contracted Hepatitis A at the Kloesels' restaurant; the Texas Department of Health concluded that this likely resulted

---

[1] At the time of their conversation, and for a few years following, Insurance Network of Texas was named Weber-Peters Insurance Agency. "INT" will be used to represent both names.

from a food handler being infected with Hepatitis A.  The Kloesels filed claims under the Burlington policy, but Burlington denied the claims based on the communicable disease exclusion.  Two separate lawsuits were then filed against the Kloesels by the Simpsons and the Lairds—customers who had contracted Hepatitis A.  Burlington defended the Kloesels in these two lawsuits under a reservation of rights.  On December 13, 1999, the Simpsons obtained a judgment in their favor (the "*Simpson* judgment") worth $242,625.  Eight months later, on August 31, 2000, the Lairds obtained a judgment in their favor (the "*Laird* judgment") worth $323,441.  INT declined to cover the Kloesels for the amounts owed under the *Simpson* and *Laird* judgments.

During the eight-month period between the *Simpson* and *Laird* judgments, the Kloesels and the Simpsons entered into an agreement entitled "Assignment and Covenant not to Execute."  Under the agreement, the Kloesels assigned to the Simpsons all negligence and statutory causes of action the Kloesels had, or would have, against INT; the assignment allowed the Simpsons to bring suit against INT in either their own name or the Kloesels' name.  The Simpsons, in return, agreed not to collect from the Kloesels any portion of the amount owed under the *Simpson* judgment.  Burlington later filed a declaratory judgment action in federal court, leading a district court for the Southern District of Texas to conclude, on March 27, 2001, that "Burlington [was] not required to indemnify [the Kloesels] for any damages recovered against [the Kloesels] based on [their] patrons contracting Hepatitis A, since the Burlington policy contains an enforceable 'communicable disease' exclusion."

## B. Trial Background

3

On March 11, 2005, after lengthy legal wrangling, the Kloesels brought suit against INT through their fifth amended petition.[2]  The Kloesels' suit proceeded to trial, where they obtained a favorable jury verdict that concluded the following:  (1) INT committed negligence that proximately caused the Kloesels' damages; (2) the Kloesels did not commit negligence that proximately caused their damages; (3) INT was "100%" responsible for the Kloesels' damages; (4) INT knowingly made misrepresentations relating to the Kloesels' insurance policy, thus causing their damages; (5) INT knowingly engaged in an unconscionable action or course of action that was the producing cause of damages to the Kloesels; (6) an award of $929,180.82 could reasonably compensate the Kloesels for their damages; and (7) the Kloesels' reasonable attorney's fees are $150,000 for preparation and trial, $50,000 for an appeal to this Court, and $25,000 for an appeal to the Texas Supreme Court.

The trial court entered a final judgment on August 1, 2005, awarding the Kloesels (1) $929,180.82 for damages, "together with prejudgment interest thereon at the annual rate of 6.0% from April 15, 2005 through the date the judgment is signed"; (2) an award of attorney's fees in accordance with the returned jury charge; and (3) $4,574.97 for court costs.  INT filed motions for new trial and judgment notwithstanding the verdict ("JNOV"). Though the motions were denied, the trial court—after considering arguments raised in INT's motions—denied recovery on the DTPA and insurance code allegations.  As a result, the court eliminated the award of attorney's fees in its amended final judgment.

### C. Interpreting the "Amended Final Judgment"

---

[2] The Lairds were intervenors in this suit.

The trial court's "Amended Final Judgment" differed from the "Final Judgment" in that the amended judgment did not afford the Kloesels an award of attorney's fees. The trial court, in the amended judgment, provided the following explanation for the change:

> [T]he Court entered Judgment based upon the Jury's verdict and the Defendants filed a Motion for New Trial and Motion for Judgment N.O.V., which, after considering the response thereto and hearing argument of Counsel, the Court granted in part by *denying recovery on the DTPA and Insurance Code allegations* and affirming the remainder of the recovery. The Judgment previously entered by the court on August 1, 2005 is hereby amended . . . .[3]

We believe a question exists as to what exactly the trial court was "denying." We see two possibilities: (1) the trial court denied the jury's findings that INT knowingly made misrepresentations and engaged in unconscionable action, and denied the award of attorney's fees as a result of this decision; or (2) the trial court did not deny the aforementioned findings, but determined independently of those findings that awarding attorney's fees under the DTPA was improper and should be denied. The trial record allows for both possibilities, given that INT's motions asserted that (1) the jury's DTPA finding was not supported under the law, and (2) the Kloesels' attorney erred by failing to segregate fees attributable to the Kloesels' DTPA claim, which INT asserted was required because the Kloesels' DTPA claim was joined with another claim for which attorney's fees were not recoverable.

Neither findings of fact nor conclusions of law accompany the amended judgment. When an appellate court seeks to interpret a vague judgment, the judgment, like other written instruments, is to be "construed as a whole toward the end of harmonizing and

---

[3] Emphasis added.

5

giving effect to *all the court has written*."[4]  The entire content of the judgment and the

record should be considered.[5]  In the instant case, the amended judgment states that the

trial court is "denying recovery on the DTPA and Insurance Code *allegations*."  The lack

of any reference to attorney's fees and the use of the term *allegations* causes us to believe

that the trial court rejected the Kloesels' DTPA causes of action, thus prompting the court's

decision to deny the award of attorney's fees.  Because the record further permits such a

belief, we consider this to be the course of action taken by the trial court.  We will thus

focus solely on the jury's negligence finding—not the misrepresentation and

unconscionable conduct findings—in assessing whether the jury's award of damages

should be upheld.

### D. Issues on Appeal

INT's appeal and the Kloesels' cross-appeal arose from the trial court's amended

judgment.  In ten issues, INT raises arguments relating to (1) the Kloesels and Simpsons'

assignment and covenant not to execute (issues two, three, four, and nine); (2) the jury's

negligence finding against INT (issues one, five, six, and eight); (3) the jury's finding that

the Kloesels were not contributorily negligent (issue ten); and (4) the trial court's jury

charge (issue seven).  The Kloesels, in their cross-appeal, assert that the trial court erred

by not properly awarding prejudgment interest and by failing to award attorney's fees.

### II. ASSIGNMENT & COVENANT NOT TO EXECUTE ISSUES

In the issues relating to the assignment, INT contends that the Kloesels did not have

---

[4] *See Constance v. Constance*, 544 S.W.2d 659, 660 (Tex. 1976) (emphasis added).

[5] *See Lone Star Cement Corp. v. Fair*, 467 S.W.2d 402, 405 (Tex. 1971).

standing in the trial court, and that the trial court therefore lacked subject matter jurisdiction to hear this case.[6] Because subject matter jurisdiction is a threshold issue affecting the power of this Court to reach the merits of INT's appeal,[7] we first address INT's assignment arguments, as well as related arguments concerning the covenant not to execute. These arguments cannot adequately be addressed, however, without first explaining our interpretation of the Kloesels' assignment, covenant not to execute, and fifth amended petition.

**A. This Court's Interpretation of the Assignment & Covenant Not to Execute**

As previously mentioned, the Kloesels assigned their claims to the Simpsons in exchange for a covenant not to execute (the "covenant"). A dispute exists between INT and the Kloesels regarding the scope of the assignment and covenant. INT asserts that the Kloesels assigned to the Simpsons *all* causes of action the Kloesels had, or would have, against it, thus contending that the Kloesels had no standing to sue for damages incurred through either the *Simpson* or *Laird* judgment. INT also asserts that the covenant "operated as a release from the [*Simpson* and *Laird*] judgments and as a matter of law those judgments cannot form the basis for the [Kloesels'] damages awarded by the trial court." The Kloesels, on the other hand, assert that the assignment and covenant are entirely unrelated to the *Laird* judgment. We agree with the Kloesels.

INT's paraphrasing of the assignment on appeal excludes language that clearly demonstrates the Kloesels' intent to only assign causes of action stemming from the

---

[6] *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993).

[7] *See id.*

*Simpson* judgment. The assignment states, in relevant part, that the Kloesels "do hereby irrevocably assign to the Simpsons, all causes of action for damages they might have or later acquire against . . . Insurance Network Of Texas . . . with regard to any negligence in exposing [the Kloesels] to the Judgment entered in C.A. No. 98-25812; *Judy Simpson and Sidney Simpson v. Kloesels' Steakhouse, Inc.* . . . ."[8] It also states that "the Kloesels assign each and every cause of action . . . on the account of, or arising out of, the entry of the Judgment rendered *in the underlying case* . . . ."[9]

Furthermore, INT has provided no argument for why this Court should ignore the "First Amendment to Assignment and Covenant Not to Execute," an agreement that was entered into by the Kloesels and Simpsons for the purpose of clarifying the intent of the assignment.[10] The agreement states:

> At no time did the parties to the Assignment and Covenant not to Execute intend or contemplate that the assignment to the Simpsons would encompass anything other than a remedy for the Judgment entered in cause no. 98-25812; in other words, it was never contemplated or intended that the Simpsons were to be given all of the Kloesels' causes of action for different claims that might be reduced to Judgment sometime in the future in favor of other claimants.

With regard to the covenant, INT never attempts to explain how it releases the Kloesels from liability under the *Laird* judgment. Finding no reason ourselves, we conclude that only the *Simpson* judgment is implicated by the covenant.

---

[8] Emphasis added.

[9] Emphasis added.

[10] "[A]ssignments are governed by contract law. Contracts, of course, may be amended. A modified agreement takes the place of the original." *Cadle Co. v. Henderson*, 982 S.W.2d 543, 546 (Tex. App.–San Antonio 1998, no pet.) (citations omitted). "[J]urisdictions have validated amendments to assignments, even if those amendments occur after suit has been filed." *Id.*

8

**B. This Court's Interpretation of the Fifth Amended Petition**

Because the Kloesels retained causes of action against INT stemming from the *Laird* judgment, and the Simpsons were assigned causes of action against INT stemming from the *Simpson* judgment, both the Kloesels and Simpsons initially brought suit against INT through the "Plaintiffs' Original Petition," which stated: "COMES NOW Plaintiffs, HARVEY KLOESEL and DIANA KLOESEL, INDIVIDUALLY AND D/B/A Kloesels' STEAKHOUSE, INC., JUDY SIMPSON and SIDNEY SIMPSON, complaining of the Defendant[] . . . INSURANCE NETWORK OF TEXAS . . . ." This style was present in the first, second, third, and fourth amended petitions, but was changed in the fifth amended petition to exclude the names of the Simpsons. In "Plaintiff's Supplemental Response to Defendant's Motion to Dismiss," the Kloesels' trial counsel explained to the court why the Simpsons' names had been deleted from the fifth amended petition, stating: "Since the Assignment from the Kloesels to the Simpsons gave the Simpsons permission to sue in the Kloesels' names, the action as it now stands preserves both the Kloesels' and the Simpsons' causes of action."[11] In other words, counsel argued that the Kloesels' name in the fifth amended petition represented both the Kloesels and Simpsons.[12]

The use of the Kloesels' name to refer to both parties warrants concern considering the confusion such a practice may cause. It did, in fact, create confusion for this Court—a confusion that was exacerbated by the failure of appellate counsel on both sides to acknowledge or explain the dual use of the Kloesels' name in the fifth amended petition.

---

[11] We note that the Simpsons and Kloesels were represented by the same attorney at pretrial and trial.

[12] To avoid confusion, we note that any reference to "the Kloesels" in this opinion is intended to refer to only Harvey and Diana Kloesel. Sidney and Judy Simpson will be referred to as "the Simpsons" and not as "the Kloesels."

9

In reviewing law relevant to this matter, we found that (1) assignments may be whole or partial transfers of the assignor's claim;[13] (2) the beneficial owner of a cause of action may bring suit in the name of his or her assignor;[14] and (3) the petition does not need to show that it is brought for the benefit of another if the beneficial owner instituted the suit in the name of the assignor.[15] Though we have not uncovered any statute or case law that would necessarily prohibit the beneficial owner and assignor from sharing the same name in a petition, we believe that such a practice is only permissible when the defendant has been informed of the dual use of the assignor's name.[16] In the instant case, INT was apprised of the petition's dual use of the Kloesels' name. Moreover, INT did not raise arguments specifically challenging the propriety of this action. Therefore, we will consider the Kloesels' name, as used in their fifth amended petition, as referring to both the Kloesels and the Simpsons. It is with this understanding of the petition, as well as our aforementioned view of the assignment and covenant, that we now address INT's arguments.

### C. INT's Assignment & Covenant Arguments

We begin by addressing INT's second issue, wherein INT argues that the Kloesels'

---

[13] *Rainey-Mapes v. Queen Charters, Inc.*, 729 S.W.2d 907, 911 (Tex. App.–San Antonio 1987, writ dism'd).

[14] *See Seiter v. Smith*, 105 Tex. 205, 147 S.W. 226, 228 (1912).

[15] *See Camden Fire Ins. Ass'n v. Eckel*, 14 S.W.2d 1020, 1021-22 (Tex. Comm'n App. 1929, judgm't adopted).

[16] *See* RESTATEMENT (SECOND) OF JUDGMENTS § 37 cmt. D (1982) ("[I]f the obligor is not informed of the separation of ownership of the claims, he is justified in assuming that the action is by the transferor. The transferor has induced this assumption by transferring the claim to one allowed to bring suit in the transferor's name, while failing to apprise the obligor of the fact. As between the obligor and the transferor, it is therefore just that the latter bear the consequences ensuing from the discrepancy between appearance and reality regarding the parties involved in the action.").

assignment to the Simpsons is against public policy in light of the Texas Supreme Court's decision in *State Farm Fire & Casualty Company v. Gandy.*[17]  In *Gandy*, the supreme court held that a defendant's assignment of his claims against his insurer to a plaintiff is against public policy if all of the following occurs:

> (1) it is made *prior* to an adjudication of plaintiff's claim against defendant in a fully adversarial trial, (2) defendant's insurer has tendered a defense, and (3) either (a) defendant's insurer has accepted coverage, or (b) defendant's insurer has made a good faith effort to adjudicate coverage issues prior to the adjudication of plaintiff's claim.[18]

In the instant case, the Kloesels assigned their claim against INT to the Simpsons *after* the Simpsons adjudicated their claim against the Kloesels in a fully adversarial trial.  Therefore, the Kloesels' assignment does not fulfill all the necessary prongs for declaring an assignment invalid under *Gandy*.  We thus overrule INT's second issue on appeal.

In issues three and nine, INT asserts that the Kloesels should not have been awarded any damages because the covenant released the Kloesels from the *Simpson* and *Laird* judgments; consequently, the trial court could not award damages on the basis of those judgments.  As already discussed, we find that the covenant did not affect what the Kloesels owed under the *Laird* judgment; therefore, the trial court was free to award damages stemming from the *Laird* judgment.  The trial court was also free to award damages stemming from the *Simpson* judgment because the Simpsons (as beneficial owners of this claim) were entitled to recover in the Kloesels' name.  Issues three and nine are overruled.

---

[17] 925 S.W.2d 696 (Tex. 1996).

[18] *Id.* at 714 (emphasis added).

11

In its fourth issue, INT contends that the Kloesels assigned to the Simpsons all causes of action the Kloesels had, or would have, against it, and that the Kloesels thus have no standing to sue for damages incurred through both the *Simpson* and *Laird* judgments. As already established, however, we find that the assignment only implicated the *Simpson* judgment. The Kloesels thus retained the ability to bring a suit for damages stemming from the *Laird* judgment, and the Simpsons were free to bring a suit in the Kloesels' name for damages stemming from the *Simpson* judgment. Accordingly, INT's fourth issue is overruled.

### III. NEGLIGENCE ISSUES

At trial, the Kloesels argued that INT was negligent for (1) failing to "refer the Kloesels to an agency which could obtain the necessary coverage"; (2) failing "to advise [the Kloesels] of this critical deletion of coverage from its former policy" (i.e., explain policy terms); and (3) procuring a general liability "policy for [their] restaurant that excluded coverage for communicable disease." The jury charge in this case did not require the jury to specify the negligent act that INT committed to cause the Kloesels' damages. Therefore, we must render judgment on the jury verdict if any of INT's alleged failures constituted negligence and proximately caused the Kloesels' loss.[19]

INT's appeal attacks the jury's negligence finding through four issues. INT asserts that (1) it had no legal duty to refer the Kloesels to another insurance agency (issue six); (2) it had no legal duty "to explain the exclusions in the insurance coverage" (issue one); (3) it did not proximately cause the Kloesels' damages because "the [Kloesels are] charged

---

[19] *See May v. United Servs. Ass'n of Am.*, 844 S.W.2d 666, 668 (Tex. 1992).

12

with having read the insurance policy exclusion in question" (issue five); and (4) there was insufficient evidence to support the finding because "it was uncontroverted that [INT] gave written notice to [the Kloesels] that the insurance policies contained a Communicable Disease exclusion" (issue eight). In another negligence-related issue (issue ten) INT asserts that there was factually insufficient evidence to support the jury's negative response to the contributory negligence question "based upon the uncontroverted failure of the [Kloesels] to have read the written quotations, binders and insurance policies containing the Communicable Disease exclusion."

For purposes of clarity and organization, our analysis of these issues will begin with issues one and six, wherein INT contests the element of duty. Issues five and eight, which contest the element of proximate cause, will then be addressed along with the contributory negligence challenge raised in issue ten.

## A. INT'S NEGLIGENCE IN FAILING TO REFER & EXPLAIN POLICY TERMS

Negligence consists of three essential elements: (1) a legal duty owed by one person to another, (2) a breach of that duty, and (3) damages proximately resulting from the breach.[20] Duty is the threshold inquiry.[21] When no duty exists, there can be no negligence.[22]

### 1. INT's Duty to Refer

---

[20] *Critchfield v. Smith*, 151 S.W.3d 225, 230 (Tex. App.–Tyler 2004, pet. denied) (citing *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311(Tex. 1987)).

[21] *Id*. (citing *Poole*, 732 S.W.2d at 311).

[22] *Id.* (citing *Rosas v. Buddies Food Store*, 518 S.W.2d 534, 536 (Tex. 1975)); *Sledge v. Mullin*, 927 S.W.2d 89, 93 (Tex. App.–Fort Worth 1996, no writ); *Pickens v. Tex. Farm Bureau Ins. Co.*, 836 S.W.2d 803, 805 (Tex. App.–Amarillo 1992, no writ).

On appeal, INT asserts that it had no duty to refer the Kloesels to another agency. In response, the Kloesels do not cite case law to support the existence of a duty; they simply argue that there "should" be a duty. At trial, INT's expert witness testified that no such duty existed, and the Kloesels' expert witness testified that he knew of no case or statute that established such a duty. Likewise, this Court knows of no case law that supports the Kloesels' contention that negligence may be found in an agent's failure to refer, and we decline to create such case law through this opinion. Because INT did not have a duty to refer, the jury's verdict cannot rest on this negligence theory. Issue six is therefore sustained.

### 2. INT's Duty to Explain Policy Terms

INT argues that it did not have a duty to explain the Burlington policy's coverage limitations to the Kloesels. In response, the Kloesels concede in their brief that there is no duty to explain. At trial, the Kloesels' expert witness testified that an insurance agent does not have a legal duty to explain the terms and conditions of an insurance policy. This testimony is in tune with the holdings of a few courts of appeals, which have likewise found that no duty to explain exists.[23] Though the Texas Supreme Court has not determined whether an agent may be liable for failing to disclose a policy's coverage limitations, it has noted that other states are willing to impose liability when there is "an explicit agreement, a course of dealing, or other evidence establishing an undertaking by the agent to determine the customer's insurance needs and to counsel the customer as to how they can

_____

[23] *See Ruiz v. Gov't Employees Ins. Co.*, 4 S.W.3d 838, 841 (Tex. App.–El Paso 1999, no pet.); *Garrison Contractors, Inc. v. Liberty Mut. Ins. Co.*, 927 S.W.2d 296, 300 (Tex. App.–El Paso 1996), *aff'd*, 966 S.W.2d 482 (Tex. 1998); *Amarco Petroleum, Inc. v. Tex. Pac. Indem. Co.*, 889 S.W.2d 695, 699 (Tex. App.–Houston [14th Dist.] 1994, writ denied); *Heritage Manor of Blaylock Props., Inc. v. Petersson*, 677 S.W.2d 689, 691 (Tex. App.–Dallas 1984, writ ref'd n.r.e.).

14

best be met."[24]   The Kloesels, however, did not present any such evidence at trial.  They testified that they had no communication with Nitsche after their initial meeting with him; furthermore, the record does not show that the Kloesels ever consulted with anyone from INT concerning the adequacy of their liability coverage, nor that INT gave them any advice in that regard.  Therefore, even if we were willing to recognize a duty to disclose coverage limitations based on a special relationship, the evidence in this case clearly establishes that no such relationship existed.  Accordingly, we find that the jury's verdict cannot rest on INT's failure to explain the Burlington policy's coverage limitations.  Issue one is sustained.

**B. INT's NEGLIGENT POLICY PROCUREMENT & KLOESELS' CONTRIBUTORY NEGLIGENCE**

The Kloesels' remaining negligence theory asserts that INT acted negligently by selecting the Burlington policy; this theory directly challenges Nitsche's professional judgment in recommending the policy to the Kloesels.  INT's remaining issues on appeal do not negate the theory's implied contentions that INT owed a legal duty to the Kloesels or that it breached a duty owed.  More specifically, INT does not (1) defend the adequacy of the Burlington policy, (2) contest whether it had a duty to procure a different policy, or (3) contend that it did not breach a duty when it procured the Burlington policy.  Accordingly, the jury's implied finding that INT breached a duty owed to the Kloesels by selecting the Burlington policy remains uncontested.

The only issues INT provides that can conceivably negate the remaining negligence theory are issues five and eight, which essentially raise the same argument:  the Kloesels are the sole cause of their damages because they are charged with having read the

---

[24] *May*, 844 S.W.2d at 670 n.10.

15

Burlington policy's communicable disease exclusion.[25]  We interpret this argument as asserting that there is legally and factually insufficient evidence to show that INT's procurement of the Burlington policy *proximately caused* the Kloesels' damages.[26]  INT's proximate cause challenge—by necessitating an inquiry as to whether the Kloesels are legally presumed to have read and have knowledge of the communicable disease exclusion—touches upon a matter that traditionally goes to the issue of contributory negligence.[27]  Nevertheless, we will address this matter for all of INT's desired purposes: to assess (1) whether there is legally and factually sufficient evidence to show that INT's procurement of the Burlington policy proximately caused the Kloesels' damages (issues

---

[25] The heading of issue five states that "[t]he trial court erred in entering judgment for the [Kloesels] because as a matter of law there can be no proximate cause or producing cause to establish damages when the insured is charged with having read the insurance policy exclusion in question."  The heading of issue eight states that "[t]here is no evidence or factually insufficient evidence to support the jury's response to the negligence issue as it was uncontroverted that [INT] gave written notice to the [Kloesels] that the insurance policies contained a Communicable Disease exclusion."  The argument in issue eight—that written notice was provided to the Kloesels—simply leads to the contention that the Kloesels should be charged with having read their insurance policy, and that INT is therefore not the proximate cause of the Kloesels' damages.  This is the same argument raised in issue five.

[26] Issues five and eight essentially challenge the jury's negligence finding against INT by asserting that there is no evidence, or legally insufficient evidence, of proximate cause.  Issue eight, however, also asserts that there was factually insufficient evidence of proximate cause.

[27] *See infra* note 64.  We have attempted to rationalize the applicability of INT's argument (that the Kloesels have presumed knowledge of their policy's contents) to the negligence finding against INT.  In so doing, we believe INT's argument may be impliedly contending that the Kloesels' presumed knowledge of their policy, and their failure to act on this knowledge by obtaining a replacement policy covering communicable disease claims, are factual matters that create a new and independent cause of their damages, thus absolving INT of any liability.  *See generally Dew v. Crown Derrick Erectors, Inc.*, 208 S.W.3d 448, 450 (Tex. 2006) (defining "new and independent cause" and noting that such a cause "supersedes the defendant's negligence . . . thereby relieving that defendant of liability").  It is not necessary for this Court to pass judgment on the propriety of negating proximate cause in this manner.  We do note, however, that the aforementioned factual matters present a clearer challenge to a negative finding of contributory negligence.  *See generally Brown v. Frontier Theatres, Inc.*, 369 S.W.2d 299, 304 ("It is the general rule in Texas that where the undisputed evidence establishes the existence of a danger and the injured party has knowledge or is chargeable with knowledge of the danger and, without justification, exercises no care whatever, then there is shown a case of contributory negligence as a matter of law.").

five and eight);[28] and (2) whether there is factually sufficient evidence to support the jury's negative finding of contributory negligence (issue ten).

### 1. Sufficiency of the Evidence Standards of Review[29]

In a legal-sufficiency review, "we must view the evidence in a light that tends to support the finding of disputed fact and disregard all evidence and inferences to the contrary."[30] However, "[t]he final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. . . . [L]egal-sufficiency review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not."[31] The jury is the sole judge of witnesses' credibility, and it may choose to believe one witness over another; a reviewing court may not impose its own opinion to the contrary.[32] Because it is the jury's province to resolve conflicting evidence, we must assume that jurors resolved all conflicts in accordance with their verdict if reasonable human beings could do so.[33]

When, as here, an appellant attacks the legal sufficiency of an adverse finding on

---

[28] It is only under this argument that we determine whether the Kloesels' remaining theory can support the jury's negligence finding. *See Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993) ("We have held repeatedly that the courts of appeals may not reverse the judgment of a trial court for a reason not raised in a point of error.").

[29] The sufficiency standards of review are set out to address both the legal and factual sufficiency challenge to the jury's negligence finding against INT (issue eight) and the factual sufficiency challenge to the jury's negative finding of contributory negligence (issue ten).

[30] *Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709, 46 (Tex. 2003).

[31] *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).

[32] *Id*. at 819.

[33] *Id.*

an issue for which it did not have the burden of proof—here, the negligence claim asserted by the Kloesels—the appellant must demonstrate that there is no evidence to support the adverse finding.[34]  Such a no-evidence challenge will be sustained when "'(a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact.'"[35]  Evidence does not exceed a scintilla if it is so weak as to do no more than to create a mere surmise or suspicion that the fact exists.[36]

In reviewing a factual-sufficiency challenge to a jury finding on an issue on which the appellant did not have the burden of proof, we consider and weigh all of the evidence and set aside the verdict only if the evidence that supports the jury finding is so weak as to make the verdict clearly wrong and manifestly unjust.[37]  In reviewing a factual-sufficiency challenge to a jury finding on an issue on which the appellant had the burden of proof—here, the defense of contributory negligence—the appellant must show that "the adverse finding is against the great weight and preponderance of the evidence."[38]  In either type of factual-sufficiency challenge, we must examine both the evidence supporting and

---

[34] *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983).

[35] *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)).

[36] *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

[37] *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Bay, Inc. v. Ramos*, 139 S.W.3d 322, 329 (Tex. App.–San Antonio 2004, pet. denied).

[38] *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001).

that contrary to the judgment.[39]   Additionally, the jury is the sole judge of witnesses' credibility, and it may choose to believe one witness over another; a reviewing court may not impose its own opinion to the contrary.[40]

## 2. Relevant Trial Testimony & Evidence

The Kloesels testified that INT did not specifically draw their attention toward the communicable disease exclusion within the Burlington policy—an exclusion that did not exist within the Providence policy previously procured by INT.  INT, in turn, established that the Kloesels received multiple written references of the communicable disease exclusion in the form of insurance binders, quotes, and policies.  INT submitted three quotes that were provided to the Kloesels.  The quotes stated a laundry list of policy exclusions that were collectively referred to as "Conditions."  Though the "Conditions" within the quotes shared a similar format, they varied with regard to the order in which exclusions were listed.   The following three paragraphs, containing the communicable disease exclusion, appeared in the 1994, 1995, and 1997 quotes, respectively.

> Conditions:   Exclude: Employment Related Practices, Communicable Disease, Lead-Bearing Substance, Punitive Damages, New Entitles, Total Pollution, Asbestos, Sexual Action, Host Liquor, Assault and Battery, Work to Subways / Tunnels / Bridges / Sewers and Dams.  Bodily injury or Property damage caused by aircraft or watercraft arising out of a contractual liability. Work performed by subcontractors is excluded.

> Conditions:   EXCLUDE: PERSONAL & ADVERTISING INJURY, MEDICAL PAYMENTS, FIRE DAMAGE, EMPLOYEES AS INSURED, EMPLOYMENT RELATED PRACTICES, NEW ENTITIES, TOTAL POLLUTION, COMMUNICABLE DISEASE, LEAD-

---

[39] *See id.*; *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989).

[40] *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

BEARING SUBSTANCE, PUNITIVE DAMAGES, ASBESTOS, SILICA DUST, TOXIC SUBSTANCE, SEXUAL ACTION, ASSAULT OR BATTERY, INDEPENDENT CONTRACTORS AND THEIR EMPLOYEES ATTACH: CONTRACTUAL LIABILITY LIMITATION, AMENDMENT OF LIQUOR LIABILITY EXCLUSION, PRODUCTS / COMPLETED OPERATIONS HAZARDS REDEFINED

Conditions: EXCLUDE: FIRE DAMAGE, MEDICAL EXPENSE, EMPLOYMENT RELATED PRACTICES, NEW ENTITIES, TOTAL POLLUTION, COMMUNICABLE DISEASE, LEAD-BEARING SUBSTANCE, PUNITIVE DAMAGES, ASBESTOS, SILICA DUST, TOXIC SUBSTANCE, SEXUAL ACTION, ASSAULT OR BATTERY, INDEPENDENT CONTRACTORS AND THEIR EMPLOYEES ATTACH: CONTRACTUAL LIABILITY LIMITATION, AMENDMENT OF LIQUOR LIABILITY EXCLUSION

The insurance binders provided to the Kloesels in 1994 and 1995 contained paragraphs that mirrored those contained within the 1994 and 1995 quotes, respectively. Lastly, all four Burlington policies purchased by the Kloesels contained the same communicable disease exclusion, which resembled the following:

EXCLUSION – COMMUNICABLE DISEASE

This insurance does not apply to "bodily injury," "property damage," "personal injury" or "advertising injury" arising out of the transmission of or alleged transmission of any communicable disease.

Diana Kloesel, who handled the restaurant's insurance matters, did not affirmatively deny reading each of the aforementioned documents referencing the communicable disease exclusion. Diana stated that she may have read some of the insurance quotes and binders provided to her. She testified that she did not read all of the provisions in the initial Burlington policy, such as the communicable disease exclusion, because she assumed the policy (1) complied with the instructions provided to Nitsche by her husband and (2) generally had the same coverages as the Providence policy. As a result of this

20

assumption, she did not read the Burlington policies for the subsequent years because they were simply renewals of the initial Burlington policy.

Despite what she may have read, Diana testified that she did not understand what the term "communicable disease" or the exclusion itself meant until after Burlington denied claims relating to the Hepatitis A outbreak. Diana claimed that she did not inquire as to what the terms or exclusion meant because she "did not think it was necessary." In discussing why she did not telephone INT to inform the agency that she did not understand her policy's provisions, she stated that she did not call because she "did not think it was necessary" and "did not think [it] was [her] duty to do that." When asked whether the documents referencing the exclusion caused her to be aware that the restaurant would not be covered for an event like the Hepatitis A outbreak, Diana replied that they "did not ring an alarm" because she "depended on [Nitsche] to . . . get a policy that did exactly what Harvey and [she] sat down and talked with [Nitsche about]."

According to the Kloesels, when they first talked with Nitsche about having INT procure insurance policies for their restaurant, Harvey told Nitsche that he wanted "100 percent coverage on his policy, to be protected . . . for all the things that's [sic] necessary for a restaurant . . . to stay in business and be protected." Harvey further stated that he wanted to be "fully covered. He wanted . . . plenty of insurance on the building for fire or any damages. And he wanted to be . . . covered if someone . . . got hurt in some way. He wanted to be covered if a customer got sick or if there was anything wrong with the food, . . . he just wanted everything covered." The Kloesels did not specifically tell Nitsche, however, that they had concerns about, or wanted coverage for, claims relating to communicable disease, Hepatitis A, or the transmission of disease from employees to

21

customers.

The Burlington policy was the only policy offered by INT to the Kloesels for the 1994–1995 policy year. Diana testified that had she understood the import of the communicable disease exclusion, she would not have purchased the Burlington policy and would have contacted another "insurance agency to see if [she and her husband] could find what [they] were looking for." She also stated that after the outbreak, and during the time they were being sued, INT offered the Kloesels a policy with Scottsdale Insurance Company. The Kloesels purchased the Scottsdale policy because it covered communicable disease related claims and because they "didn't have time to shop" elsewhere.

The Kloesels' agent, Nitsche, testified that although an agent looks after his clients' best interests, an agent's ability to effectively do this depends on the clients informing the agent as to "what is important to them." Though Nitsche conceded that his clients come to him expecting him "to have more knowledge than they have about insurance coverage"—an expectation he conceded his clients rely on—he explained that clients still "have to tell [the agent] their specific needs so [the agent], in turn, can get the answer from the insurance company." If he knows "what's important to [the clients], [he] will communicate that information to [his] insurance company and they will provide to [him] . . . the best available policy that's available for [his] customer." Nitsche testified that he does not, however, tell his clients "what's best for them. Only they know what's best for them."

According to Nitsche, it is not possible to satisfy a request to obtain "full coverage" because every policy contains exclusions. Nitsche contended that he satisfied the Kloesels' instructions because the Burlington policy covered food poisoning; he asserted,

22

without explanation, that there was a "big difference" between "somebody getting sick and somebody getting a disease."  Nitsche was aware that the Burlington policy contained a communicable disease exclusion; he explained, however, that he did not fully understand the import of the exclusion.  This is because it is the insurer that ultimately makes coverage decisions, and because "[i]t's the insurance company that decided on the language.  It's their forms."  Nitsche further explained:  "If there's ever a technical question, we get it from [the insurer].  They're . . . the company in charge."  Consequently, Nitsche and INT do not simply provide clients with an opinion or their "best guess" regarding the meaning of policy terms; rather, "if there's a question about a definition . . . they obtain that answer from the insurance company or the broker in writing so [they] can communicate it back to [their] client."

Nitsche testified that his education, training, and experience has not resulted in him knowing all of a restaurateur's "biggest risks," and that restaurateurs should know their businesses better than he does.  When asked, however, whether he expected the Kloesels to understand the import of the communicable disease exclusion, Nitsche replied:  "I have no idea what they know, if they know what a communicable disease is.  But you know, they are in the restaurant business.  *To me, that would be a very important part of their operation*, and I mean, just not a communicable disease."[41]  Nitsche testified that he believed the Kloesels understood the exclusion, stating:  "I think they should definitely know because they had documentation in front of them to—if they had a problem with it, they would've called."  He explained that clients, like the Kloesels, could call INT to acquire

---

[41] Emphasis added.

23

information relating to their policy.

Roy F. Phillips, the Kloesels' expert witness, testified that he believed INT was negligent in procuring a policy for the Kloesels. Phillips contended that at the time that INT initially procured the Burlington policy, in addition to the time of the Hepatitis A outbreak, alternative policies were available that covered communicable disease claims and other critical risks pertinent to the Kloesels' restaurant. Though he acknowledged that the Burlington policy covered some "catastrophic risks" that were uniquely pertinent to a restaurateur, it was his view that "communicable disease [was] absolutely the number one exposure." Phillips stated that he would "absolutely not" procure a policy for a restaurateur that excluded communicable disease claims. He testified that because communicable disease is the "biggest hazard [the Kloesels] have," had he procured the Burlington policy for the Kloesels, he would have talked about the communicable disease exclusion with them and would have had them acknowledge a letter that detailed the conversation.

Gary Beck was INT's expert witness. He asserted that INT "exceed[ed] the standard of care" in communicating policy information to the Kloesels. According to Beck, under the law of the State, insureds are "deemed to know what's in their policy if they've received it," without regard to whether the insured has actually read the policy. He also expressed his belief that an insured, rather than an agent, is in a better position to know what is important to them in terms of insurance coverage. When asked whether an agent, in procuring a liability policy for a restaurateur, acts prudently by obtaining a policy that excludes communicable disease claims, Beck responded: "Ideally, you would want communicable diseases to be covered, but you can't get everything covered." It was further revealed that when asked this same question during his deposition, Beck responded: "I would agree that

24

that's not the desired coverage form."

Beck testified that if the Kloesels were his customers, "it's possible" that he would have procured a policy containing a communicable disease exclusion. He then elaborated on this response, stating: "If I knew there was something out there that had the coverage, and I knew an agent that had it, I might've referred them. I would've—I would've probably made Mr. Kloesel aware of it." Beck claimed, however, that he ultimately would not have referred the Kloesels to another agent because he thought that he would have "been able to get the proper restaurant coverage" for the Kloesels. Beck's cross-examination concluded with the following exchange:

Q.   Mr. Beck, as the owner of a restaurant, would you agree with me that it would never be prudent to purchase a CGL policy that excluded coverage for communicable disease?

A.   As the owner, would it be prudent? Ever?

Q.   Yeah.

A.   If it was the only policy I could get. I wouldn't want to—

Q.   But—

A.   —but it might—if—if it was the only policy that was available, if every insurance company in the world says, "were not going to write—we're not going to cover communicable—or whatever, exclude communicable disease," then rather than go without coverage generally, you might do it.

Q.   But if you're going to have coverage, you want to make sure your coverage includes communicable disease.

A.   Sure.

### 3. Legal Framework Governing this Court's Disposition of the Issues

The Texas Supreme Court afforded significant attention to the Kloesels' negligence

theory in *May v. United Services Association of America*. In *May*, Daryl and Faith May visited an insurance agency, where the Mays spoke with an agent.[42] The Mays told the agent that they were planning to have children and were interested in maternity and dependent health coverage;[43] the Mays informed the agent that this interest stemmed from Faith May previously losing an infant child.[44] The agent provided the Mays with the Double Eagle policy, which "featured relatively low premiums and deductibles," but contained a "termination provision [that] allowed the underwriter to cancel the entire group at any time. The policy also contained a deferral provision that permitted the underwriter to defer coverage on group members or covered dependents who were hospitalized or totally disabled at the time coverage began."[45] Sixteen months after acquiring the Double Eagle policy, Faith May gave birth to a child that was born "with congenital heart and lung disorders that required immediate medical attention."[46] Though the policy initially covered the child's medical expenses, a change in underwriters occurred and the new underwriter "classified [the child] as a totally disabled dependent and, asserting the deferral provision of the policy, refused to cover any of his medical expenses."[47] The child eventually died

---

[42] *May*, 844 S.W.2d at 667.

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] *Id.* at 668.

[47] *Id.* According to the supreme court:

The deferral provision became applicable anew for all insured individuals when there was a change of underwriters. Thus, hospitalized or disabled individuals whose medical care was covered because they became disabled at a time when they were already covered under the policy, or because they were born to individuals who were covered under the policy, faced the risk that they would lose coverage if the current underwriter dropped the entire group and

after living over two years without insurance coverage.[48]

The Mays sued the agency, alleging its agent made misrepresentations and acted negligently by recommending and allowing the Mays to purchase the Double Eagle policy.[49] The Mays acknowledged at trial that the agent told them "of the termination provision allowing an underwriter to cancel coverage for the entire group."[50] The trial court entered its judgment based on the jury's verdict, which found in the Mays' favor on the negligence claim, but not on the misrepresentation claim.[51] The court of appeals reversed the negligence finding. The supreme court then affirmed the judgment of the court of appeals, finding that there was no evidence in the record "that the agent breached the duty to use reasonable care, skill and diligence in procuring insurance in any way that proximately caused harm to the [Mays]."[52] In the course of arriving at this finding, the supreme court observed that though "[t]he Mays claim that [the agent] was negligent because he should have known of the risk posed to them by the potential shifting of the underwriters, . . . they offer no evidence as to why this risk was unjustified for them in particular, or why [the agent] should have prevented them from assuming it."[53]

---

a new underwriter took over.

*Id*. at 672 (footnotes omitted).

[48] *Id*. at 668.

[49] *Id*. at 671.

[50] *Id*. at 670.

[51] *Id*. at 666.

[52] *Id*. at 666-67.

[53] *Id*. at 672.

In the instant case, INT established at trial that the Kloesels received ample documentation noting the communicable disease exclusion. The purpose of establishing this was to formulate the argument that the Kloesels were given adequate notice of the exclusion, should thus be presumed to have read the exclusion, and should thus be considered the sole proximate cause of their damages. Unlike INT, the agency in *May* did not have to argue that the insureds should be charged with having read the complained of policy provision because, as previously mentioned, the insureds in *May* readily admitted that they were made aware of the provision.[54] The *May* court, however, did not reject the Mays' negligence theory based on this admission; rather, it rejected the theory after (1) assessing the nature of communications between the Mays and their agent prior to the policy's procurement, and (2) rejecting the Mays' contention that the procured policy was uniquely unsuited for them.[55] We read *May* as containing an implicit rejection of INT's assertion that an insured's actual or implied reading of an insurance policy operates, without exception, to bar the insured from recovering damages that are derived from an agent's negligent procurement of that policy.[56] Even if we misconstrue *May*, however, this Court finds that independent reasons exist for rejecting INT's position.

In cases involving a suit brought by an insured against an insurer, Texas courts have held that the insured is under a positive duty to read his policy and is presumed to

---

[54] *Id*. at 670.

[55] *Id*. at 672-73.

[56] We note that if INT's reasoning under issues six and eight is correct, it appears as if the *May* majority missed a very simple means of dismissing the Mays' negligence theory. Under INT's reasoning, the court could have quickly determined that the Mays were the sole proximate cause of their damages upon seizing hold of the fact that the Mays' admitted to being told of the policy provision at issue.

28

have done so,[57] thus providing the basis for rejecting the insured's attempt to reform the policy. These cases, however, are distinct from suits brought by an insured against an *agent*. In *Aden v. Fortsh*, the New Jersey Supreme Court succinctly explained this distinction, stating:

> When one contracts with another, the contracting parties may have an obligation to read the contract because if they assent without so doing, they cannot later assert that their agreement was different from that expressed in writing. Even in the contract-reformation context, there are exceptions to the rule, as when an insured "in all likelihood, will not read [the policy] over again and may not fairly be expected to do so." In any event, what distinguishes the situation in which an insured employs the assistance of a professional insurance intermediary is that the insured then has the right to rely on the skilled broker's presumed competence in executing the instructions given. Unlike when an insured sues an insurer, in a malpractice suit a written contract is not being challenged.[58]

The distinction drawn in *Aden* fosters an improved understanding of the legal analysis utilized by the Texas Supreme Court in *Colonial Savings Association v. Taylor*.[59] *Colonial* involved a suit brought by an insured against a party that was deemed to have essentially assumed the role of an agent for the insured.[60] The court stated that while some jurisdictions have held that an insured has a legal duty to read his policy, the prevailing view—joined by this State—is as follows:

> "[A]n insured who accepts a policy without dissent, is presumed to know its contents, but the presumption may be overcome by proof that 'he did not

---

[57] *E.g., Ruiz*, 4 S.W.3d at 841; *Cont'l Cas. Co. v. Bock*, 340 S.W.2d 527, 533 (Tex. Civ. App.–Houston 1960, writ ref'd n.r.e).

[58] *Aden v. Fortsh*, 776 A.2d 792, 805 (N.J. 2001) (citations omitted).

[59] 544 S.W.2d 116, 119 (Tex. 1976).

[60] *Id*. at 119 ("Although Colonial was not an insurance agent or insurer issuing a policy to Taylor for consideration, Colonial did voluntarily undertake to provide insurance coverage for Taylor's property (as found by the jury), and in this undertaking Colonial's duty was similar to that of an insurance agent.").

29

know its contents when it was accepted, as by showing that when he received it he put it away without examination, or that *he relied upon the knowledge of the insurer and supposed he had correctly drawn it.*'"[61]

The court held that when an insured presents sufficient proof to overcome the presumption, it then becomes the agent's "burden to prove that [the insured] was negligent in failing to read the policy."[62]  If the fact-finder determines that the insured was not negligent, the insured's failure to read will not bar his recovery;[63] this determination will traditionally necessitate the inclusion of a contributory negligence question in the court's charge.[64]

An insured's reading of certain policy provisions will often result in nothing more than an exercise of the eyes.  In other words, the fact that an insured has made himself cognizant of the existence of certain terms in his policy does not necessarily mean that the

---

[61] *Id.* (quoting *Fireman's Fund Indem. Co. v. Boyle Gen. Tire Co.*, 392 S.W.2d 352, 355 (Tex. 1965) (quoting *Del. Ins. Co. v. Hill*, 127 S.W. 283, 286-87 (Tex. Civ. App. 1910, writ ref.))) (emphasis added).

[62] *Id.* (citing *Schustrin v. Globe Indem. Co.*, 130 A.2d 897 (N.J. Super. Ct. App. Div. 1957)).

[63] *Id.*

[64] *Schustrin*, 130 A.2d at 899 (holding that "the mere failure on the part of an insured to read a policy does not *per se* bar a recovery, but is a circumstance to be considered on the question of the plaintiff's contributory negligence"); see *Colonial*, 544 S.W.2d at 119; *see also Frank B. Hall & Co. v. Beach, Inc.*, 733 S.W.2d 251, 264 (Tex. App.–Corpus Christi 1987, writ ref'd n.r.e.) (recognizing that an insurance agent—who was raising a duty-to-read defense in response to a suit for negligence brought against him by an insured—was entitled to have the jury charge contain a contributory negligence question).

We note that in addition to this State, many other jurisdictions have determined that an insured's failure to familiarize himself with his policy simply allows the agent to assert a contributory negligence defense, presenting a jury question in negligence actions. *See, e.g., Darner Motor Sales v. Universal Underwriters Ins. Co.*, 682 P.2d 388, 403 (Ariz. 1984); *Floral Consultants, Ltd. v. Hanover Ins. Co.*, 470 N.E.2d 527, 529 (Ill. App. Ct. 1984); *Medtech Corp. v. Indiana Ins. Co.*, 555 N.E.2d 844, 850-51 (Ind. Ct. App. 1990); *Johnson & Higgins of Pa., Inc. v. Hale Shipping Corp.*, 710 A.2d 318, 326 (Md. Ct. Spec. App. 1998); *Twelve Knotts Ltd. P'ship v. Fireman's Fund Ins. Co.*, 589 A.2d 105, 114 (Md. Ct. Spec. App. 1991); *Fillinger v. Nw. Agency, Inc., of Great Falls*, 938 P.2d 1347, 1352 (Mont. 1997); *Stoes Bros. v. Freudenthal*, 463 P.2d 37, 40 (N.M. Ct. App. 1969); *Fobare v. Mohawk Nat'l Bank*, 352 N.Y.S.2d 138, 142 (N.Y. Sup. Ct. 1974); *Kirk v. R. Stanford Webb Agency, Inc.*, 330 S.E.2d 262, 264 (N.C. Ct. App. 1985); *Schustrin*, 130 A.2d at 899; *Martini v. Beaverton Ins. Agency*, 838 P.2d 1061, 1067 (Or. 1992); *Riddle-Duckworth, Inc. v. Sullivan*, 171 S.E.2d 486, 492 (S.C. 1969).

insured has thus acquired an understanding or appreciation of those terms. This is because policy provisions may be simple *or* complex, and the insured reading the provisions may be an experienced business person who is insurance savvy *or* an unsophisticated individual who knows nothing about insurance. It thus behooves an insured to not only read his policy, but to also question his agent on terms and conditions that are not understood; the agent's reiteration as to what is covered under the policy will assist the insured in any later lawsuit.[65] Though it clearly advantages an insured to explore any confusion over terms read but not understood, it is not clear that an insured is always negligent in failing to do so.

When we assess whether an insured is negligent in failing to read his policy, we do not do so for the purpose of determining whether the insured should be excused from failing to exercise his eyes; rather, we do so for the ultimate purpose of determining whether the insured should be excused from failing to know and understand the contents of his policy. An assessment of an insured's negligence in remaining silent shares the same ultimate purpose. Accordingly, we believe a fact-finder should be able to determine that an insured is not negligent for failing to question or investigate the policy terms he reads, but does not understand.[66] In order to arrive at this determination, the fact-finder

---

[65] "Efforts on behalf of insureds to understand their policy remain an effective means of resolving insurance disputes before they reach the litigation stage. An insured who does not review his or her policy will forego such an advantage." *Aden*, 776 A.2d at 83.

[66] Embracing a contrary conclusion creates perplexing results. Let us assume, for instance, that in a suit brought by an insured against his agent, the agent raises the defense that the insured is negligent for failing to read the policy provision that now serves as the basis for the insured's suit. The insured then responds by arguing that his failure to read resulted from his reliance on the agent's knowledge and the assumption that the agent had acquired the coverage requested. In the end, the fact-finder—upon assessing the evidence relevant to the insured's reliance—determines that the insured was not negligent for failing to take an affirmative step towards familiarizing himself with the provision (i.e., failing to read the provision).

31

must find that (1) it was reasonable for the insured to have not understood the import of the terms read, and (2) the insured's failure to acquire an understanding of the terms was directly related to the insured's reasonable reliance on the agent's knowledge and the assumption that the agent had correctly drawn the policy in conformance with said knowledge. Given the varying complexity of insurance terms and provisions, the varying degrees of insurance knowledge possessed by insureds, and the varying communications that may exist between an agent and insured, a fact-finder should assess what is reasonable on a case-by-case basis. The common-sense rationale for permitting a fact-finder to find in an insured's favor is as follows:

> "[W]hen [an agent] of repute is employed to effect an insurance against certain risks, the client is entitled to rely upon his instructions being properly carried out. It is no answer for the [agent] to say: 'I handed you the policy and you should have examined it and seen whether it gave you the protection you required.' . . . Business could not be carried on . . . if, when a person has been employed to use care and skill with regard to a matter, the [client] is bound to use his own care and skill to see whether the person employed has done what he was employed to do."[67]

Because "[a]n insured who hires and pays a professional [agent] does so to reduce, if not eliminate, the risk that an inadequate policy will be procured,"[68] it stands to reason that

---

What would result, however, if the nature of the suit and the evidence relating to the insured's reliance remained the same, but the insured now contends that he read the complained of provision, while maintaining that he never comprehended its import nor initiated an attempt to decipher it? Should the insured's reading of the provision now prohibit the fact-finder from determining that the insured was not negligent for failing to take an affirmative step towards familiarizing himself with the provision (i.e., failing to question and investigate the provision's import)? Answering this question in the affirmative simply serves to discourage the insured from ever reading his policy. The insured is deterred from taking the most basic step towards safeguarding his interests because doing so serves to constrain his ability to sue his agent should he later incur damages stemming from what is discovered to be his agent's negligence in procuring the policy. We are not inclined to permit such a result.

[67] Aden, 776 A.2d at 805-06 (quoting Hampton Roads Carriers v. Boston Ins. Co., 150 F. Supp. 338, 343-44 (D.C. Md. 1957) (quoting ARNOULD ON MARINE INSURANCE 160 (13th ed., 1950))).

[68] Id. at 805.

32

"[i]nsurance consumers who instruct their [agents] to provide coverage [should be] entitled to have those instructions followed without regard to the insured's failure to detect the [agent's] negligent conduct."[69]

An agent's client should be able to rely on the agent's knowledge in two respects. First, when the agent's knowledge is composed of his client's instructions regarding the qualities desired in a policy, the client may rightly assume that the agent will procure a policy in conformance with such knowledge. Second, the client may rightly assume that the agent will procure a policy that a reasonably prudent agent would procure—a policy that is reflective of the agent having exercised the appropriate degree of skill and knowledge that an agent is expected to have upon entering the profession.[70]

### 4. Applying the Facts to the Framework

As established above, determining whether an insured is negligent for failing to fulfill his duty to read is simply representative of a broader determination that inquires into whether an insured is negligent for not knowing and understanding his policy's contents.

---

[69] *Id.* at 806. Unless circumstances exist for parties to think otherwise, we believe that an insured is entitled to rely on an agent to follow his instructions when not only procuring an initial policy, but also subsequent replacement policies.

[70] The New Jersey Supreme Court provided analysis pertinent to this matter in *Rider v. Lynch*:

> One who holds himself out to the public as an insurance broker is required to have the degree of skill and knowledge requisite to the calling. When engaged by a member of the public to obtain insurance, the law holds him to the exercise of good faith and reasonable skill, care and diligence in the execution of the commission. He is expected to possess reasonable knowledge of the types of policies, their different terms, and the coverage available in the area in which his principal seeks to be protected. If he neglects to procure the insurance or if the policy is void or materially deficient or does not provide the coverage he undertook to supply, because of his failure to exercise the requisite skill or diligence, he becomes liable to his principal for the loss sustained thereby.

201 A.2d 561, 567 (N.J. 1964) (citations omitted).

It is this latter determination that guides the Court's analysis in the instant case.[71]

The Kloesels' testimony established the following: (1) the Kloesels did not read the Burlington policy for the 1997–1998 policy year, nor did they fully read the previous Burlington policies; (2) in the event that they read any reference to the communicable disease exclusion in any of the binders or quotes provided by INT, they did not comprehend or investigate its import; and (3) their decision to not take affirmative steps to familiarize themselves with the exclusion was predicated upon their reliance on Nitsche's knowledge and the assumption that he had procured a policy in conformance with said knowledge. In light of this testimony, we find that the Kloesels overcame the presumption that they knew the contents of their policy, and it became the jury's task to determine whether the Kloesels' lack of knowledge resulted from their own negligence.[72]

Diana's testimony reveals that the only references to the communicable disease exclusion that she may have read were within the Burlington quotes and binders. In those documents, the exclusion was entirely formulated by the inclusion of the term "communicable disease." We believe the jury could have concluded that it was reasonable for the Kloesels to not possess this term within their lexicon. Furthermore, the jury could have rationally determined that it was reasonable for the Kloesels to not readily decipher

---

[71] Though this broader inquiry better protects an insured by affording him the opportunity to deflect contributory negligence claims while admitting to having read his policy, it also better protects the agent. The inquiry forces us to look at the totality of the communication between the insured and the agent. Assuming a more narrow focus in the present case, for instance, would complicate matters for INT. If we were to assess the Kloesels' negligence based strictly on their failure to read their Burlington policy for the 1997–1998 policy year, we would perhaps be easily inclined to find in the Kloesels' favor. This is because it was Diana's uncontested testimony that INT did not provide the Kloesels with a copy of the 1997–1998 policy; rather, INT provided a letter directing the Kloesels to refer to their previous policy for current coverage information. With the previous policies outside the scope of a narrow review, we would be left to determine whether one should have a duty to read a document he has not been provided.

[72] See supra note 64.

the term's import by simply reading the term and assessing its place within either the quotes or binders. The term was not defined and there was no accompanying information indicating the term's relevance to the food served in the Kloesels' restaurant. The jury may have also determined that the term's placement alongside other exclusions such as "Work to Subways / Tunnels / Bridges / Sewers and Dams"—exclusions that were entirely irrelevant to the Kloesels' restaurant operation—further justified the Kloesels' failure to ascertain the term's import.

The jury was also provided with evidence for assessing whether Nitsche procured a policy in conformance with the Kloesels' instructions. The Kloesels testified that they requested a policy that provided "100 percent coverage" and left their restaurant "fully covered." We find, however, that these descriptive terms were vague, thus failing to implicate any specific type of coverage that the Kloesels' desired to be procured.[73] We do not believe, however, that the same can be said with regard to the Kloesels' unconditioned request for a policy that "covered if a customer got sick or if there was anything wrong with the food." The jury could have rationally determined that the Burlington policy's communicable disease exclusion specifically contravened this instruction; considering that it was the restaurant's food that facilitated the transmission of Hepatitis A to the Kloesels' customers, it was reasonable for the jury to find that there was something "wrong with the food" at the time of the transmission and that the customers "got sick" as a result.

---

[73] *See State Farm County Mut. Ins. Co. v. Moran*, 809 S.W.2d 613, 620-21 (Tex. App.–Corpus Christi 1991, writ denied); *Oldaker v. Travelers Ins. Co.*, 497 S.W.2d 402, 404 (Tex. Civ. App.–El Paso 1973, no writ) (stating that "it would be a presumptive undertaking by the Court to attempt to define coverage intended by parties to an insurance agreement by the expression, 'full coverage'"); *see also Manion v. Sec. Nat'l Ins. Co.*, No. 13-01-248-CV, 2002 Tex. App. LEXIS 6009, at *6 (Tex. App.–Corpus Christi Aug. 15, 2002, no pet.) (not designated for publication) (citing *Moran*, 809 S.W.2d at 620-21).

Though Nitsche contended that there is an important distinction between "somebody getting sick and somebody getting a disease," we fail to see it in this context. This Court understands Nitsche's contention that an agent's ability to effectively serve his clients is partly dependent upon his clients telling him what coverages are important to them. Nevertheless, we also understand that those clients can only vocalize their desired coverage with a limited degree of specificity. As a consequence, we embrace the following viewpoint:

> [A]n insurance [agent], in dealing with his clients, ordinarily invites them to rely upon his expertise in procuring insurance that best suits their requirements. It is not necessary for the client in order to establish a breach of duty to prove that he laid out for the [agent] the elements of a contract of insurance. It is sufficient to show that he authorized procurement of the insurance needed to cover the risks indicated and that the [agent] agreed to do so but failed or neglected to perform his duty. The terms of the contract to procure the insurance, the scope of the risk and subject matter to be covered, may be found by implication.[74]

It is clear that the jury in the instant case did not fault the Kloesels for failing to specifically inform Nitsche that they had concerns about, or wanted coverage for, claims relating to communicable disease, Hepatitis A, or the transmission of disease from employees to customers. We do not find this decision unreasonable given that (1) the Kloesels were not required to lay out every element of their desired policy and (2) their desire for communicable disease coverage can be found by implication through their expressed desire to have a policy that "covered if a customer got sick or if there was anything wrong with the food."

Finally, the jury was provided with evidence for assessing whether Nitsche failed to

---

[74] *Rider*, 201 A.2d at 567.

procure a policy that a reasonably prudent agent would have procured.  The jury heard Nitsche acknowledge that communicable disease is a matter that is "a very important part of [the Kloesels'] operation."  Phillips, the Kloesels' expert witness, described communicable disease as being the Kloesels' "number one exposure" and "biggest hazard."  Phillips and INT's expert witness, Beck, both provided testimony strongly indicating that the Burlington policy should not have been procured for the Kloesels.  While Phillips stated that he would "absolutely not" procure a policy for a restaurateur that excluded communicable disease claims, Beck seemingly contended that such a policy would be appropriate if it was the only policy available—essentially testifying that the Burlington policy was only better than no policy at all.  The jury heard, however, that other policies were available at the time INT initially provided the Kloesels with the Burlington policy.  Phillips testified that INT had several options available for procuring a policy that covered communicable disease claims; Beck, on the other hand, professed his belief that he would have been able to procure a policy covering communicable disease claims had the Kloesels been his clients.  Based on all the testimony, we believe the jury had a sufficient basis for finding that Nitsche failed to procure a policy that a reasonably prudent agent would have procured.

## 5. Conclusion

Because the jury found that the Kloesels were not negligent in failing to take affirmative steps to familiarize themselves with their policy's communicable disease exclusion, the Kloesels were not barred from recovering their damages from INT.[75]  We

---

[75] *See Colonial*, 544 S.W.2d at 119.

believe the aforementioned trial evidence supports this finding. After applying the appropriate standards of review, we hold (1) that the evidence is legally and factually sufficient to find that INT's procurement of the Burlington policy was the proximate cause of the Kloesels' damages,[76] and (2) that the evidence is factually sufficient to support the jury's negative finding of contributory negligence. Issues five, eight, and ten are therefore overruled.[77]

## IV. JURY CHARGE ISSUE

In its seventh issue, INT asserts "[t]he trial court erred in refusing [its] requested jury instruction regarding the legal duty imposed on an insured to read their insurance policy." The jury charge in this case included the following question: "Do you find that Harvey and/or Diane [sic] Kloesel were negligent which was a proximate cause of their damages, if any?" The jury answered this question in the negative. Prior to the charge's submission to the jury, however, INT wrote a proposed jury charge instruction and submitted it to the trial court. Citing the supreme court's decision in *Thigpen v. Locke*,[78] INT provided the following instruction: "A party to a contract is obligated to protect itself by reading what it signs and its failure to do so is not excused by mere confidence and integrity of the other party." INT objected to the court's failure to include the instruction in the charge, and the court overruled this objection. On appeal, INT contends that "[b]y refusing the requested

---

[76] We note that because INT has failed to effectively negate all of three of the Kloesels' negligence theories, the jury's negligence finding against INT is upheld.

[77] This Court has arrived at its holdings with the understanding that "[a]n insurance agent, like other professionals, is not a guarantor of the client's happiness and should not be subject to liability any time the client is dissatisfied. . . . But as the agent should not bear responsibility for every bad result, neither should the consumer." *See May*, 844 S.W.2d at 675 (Doggett, J., dissenting).

[78] 363 S.W.2d 247, 251 (Tex. 1962).

instruction, the jury was in the dark of what the law required of the [Kloesels] and how that applied to the questions being answered by the jury."

## A. Applicable Law

We review a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard of review.[79] A trial court must submit such instructions and definitions as shall be proper to enable the jury to render a verdict.[80] The court should not burden the jury with surplus instructions.[81] Consequently, every correct statement of the law does not belong in the jury charge.[82] A party is entitled to a jury question, instruction, or definition if the pleadings and evidence raise an issue.[83] An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence.[84]

Failure to submit an instruction shall not be deemed a ground for reversal of the judgment unless a substantially correct instruction has been requested in writing and tendered by the party complaining of the judgment.[85] Substantially correct wording means "one that in substance and in the main is correct, and that is not affirmatively incorrect."[86]

---

[79] *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000).

[80] *Certain Underwriters at Lloyd's v. KKM Inc.*, 215 S.W.3d 486, 496 (Tex. App.–Corpus Christi 2006, pet. denied).

[81] *Accord v. Gen. Motors Corp.*, 669 S.W.2d 111, 116 (Tex. 1984).

[82] *Maddox v. Denka Chem. Corp.*, 930 S.W.2d 668, 671 (Tex. App.–Houston [1st Dist.] 1996, no writ).

[83] *Certain Underwriters at Lloyd's*, 215 S.W.3d at 496.

[84] *Id.*

[85] *Id.*

[86] *Placencio v. Allied Indus. Int'l, Inc.*, 724 S.W.2d 20, 21 (Tex. 1987).

Examples of improper instructions include those that misstate the law, mislead the jury, or those that comment on the weight of the evidence.[87] Impermissible comments would include those where the court assumes the truth of a material controverted fact, or exaggerates, minimizes, or withdraws some pertinent evidence from the jury's consideration.[88]

## B. Discussion

INT's submission of a proposed instruction to the trial court, as well as its objection to the jury charge when it failed to contain the proposed instruction, preserved any error for appeal.[89] After reviewing the proposed instruction in light of the arguments raised at trial, however, we find that the trial court could have properly refused the instruction because it risked misleading the jury. In proclaiming that "[a] party to a contract is obligated to protect itself by reading what it signs," the proposed instruction suggests that the obligation is conclusive—that there are no means by which an insured may negate or rebut the imposition of such an obligation.

We begin by first recognizing that even the duty to read discussed in *Thigpen*—a case involving two parties involved in a contractual dispute—is qualified by the fact that a "finding of fraud, either actual or constructive," may excuse a party to a contract from the consequences of failing to read.[90] Though *Thigpen* does not discuss additional

---

[87] *Torres v. Caterpillar, Inc.*, 928 S.W.2d 233, 241 (Tex. App.–San Antonio 1996, writ denied).

[88] *Id.*

[89] *See State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992) ("There should be but one test for determining if a party has preserved error in the jury charge, and that is whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling.").

[90] *Thigpen*, 363 S.W.2d at 253.

40

qualifications, our previous treatment of the preceding negligence issues establishes that an insured's duty to read is more qualified when assessed within the confines of a negligence suit against an agent, than it is within the confines of a contractual dispute. A fact-finder, for instance, may find that an insured was not negligent in failing to read as a result of the insured's reasonable reliance on the agent's knowledge and the assumption that the agent had correctly drawn the policy in conformance with said knowledge.[91] Furthermore, many states have held, and this Court agrees, that the extent to which an insured has a duty to read his policy is influenced by whether the policy is a new one or a renewal.[92]

The Kloesels' trial arguments permitted the jury to entertain any one of the aforementioned qualifying factors in the course of assessing the Kloesels' duty to read. As a result, the trial court could have found that INT's instruction created an unreasonable risk of harm by potentially confusing the jury into believing that the Kloesels had an unqualified duty to read. Accordingly, the trial court did not abuse its discretion in refusing INT's instruction. Because we need not reach whether the instruction was improper on any other ground, we now overrule INT's seventh issue.

## V. KLOESELS' CROSS-APPEAL

In two issues, INT's cross-appeal asserts that the trial court erred by not properly awarding prejudgment interest and by failing to award attorney's fees.

## A. Prejudgment Interest

---

[91] *See Colonial*, 544 S.W.2d at 119.

[92] *See*, *e.g.*, *Woodlawn Fraternal Lodge No. 525, F. & A.M. v. Commercial Union Ins. Co.*, 510 So. 2d 162, 164 (Ala. 1987); *Cooper v. Berkshire Life Ins. Co.*, 810 A.2d 1045, 1067 (Md. App. Ct. 2002); *Thomas v. Nw. Nat'l Ins. Co.*, 973 P.2d 804, 808 (Mont. 1998).

The Kloesels submitted a proposed judgment to the trial court which ordered that (1) the Kloesels recover $929,180.82 together with prejudgment interest of $269,711.50, and (2) "all sums of money awarded in this judgment shall bear post judgment interest in the amount of 5% per year, compounded annually." In lieu of this language appearing in the trial court's amended judgment, the judgment instead ordered that (1) the Kloesels recover $929,180.82 "together with prejudgment interest thereon at the annual rate of 6.0% from April 15, 2005 through the date the judgment is signed," and (2) "all sums of money awarded in this judgment shall bear post judgment interest in the amount of 6.0% per year, compounded annually." The Kloesels contend the trial court erred by denying the $269,711.50 requested because doing so has prevented them from being made whole.

As a prerequisite to presenting a complaint for appellate review, the record must show that a complaint was made to the trial court by a timely request, objection, or motion that stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint.[93] Further, the trial court must have ruled on the request, objection, or motion, either expressly or implicitly, or refused to rule on the request, objection, or motion, and the complaining party must have objected to the refusal.[94] Though a complaint regarding prejudgment interest must typically be preserved in the trial court through either a motion to amend or correct the judgment or by a motion for new trial,[95] we find that the Kloesels have preserved their

---

[93] TEX. R. APP. P. 33.1(a)(1)(A).

[94] *Id.* at 33.1(a)(2).

[95] *See Miller v. Kendall*, 804 S.W.2d 933, 945 (Tex. App.–Houston [1st Dist.] 1990, no writ) (motion to amend or correct judgment or motion for new trial is proper vehicle for preserving error in judgment); *see also Allright, Inc. v. Pearson*, 735 S.W.2d 240, 240 (Tex. 1987).

complaint as a result of the trial court implicitly overruling their proposed prejudgment interest award.[96]

The Kloesels assert that trial court error is evidenced by the Texas Supreme Court's holding in *Phillips Petroleum Co. v. Stahl Petroleum Co.*[97] We do not believe, however, that *Phillips* assists the Kloesels' argument. The cited to portion of the *Phillips* holding establishes that interest is allowed on unpaid interest in Texas.[98] The Kloesels were awarded $929,180.82 to compensate them for the principal amounts owed under the *Simpson* and *Laird* judgments ($323,441.52 and $242,625.34, respectively), as well as for the postjudgment interest that had accrued under both judgments as of April 15, 2005.[99] The trial court then provided for "prejudgment interest thereon at the annual rate of 6.0% from April 15, 2005 through the date the judgment is signed"; in accordance with *Phillips*, the prejudgment interest was applied to the principals *and* their accrued postjudgment interests. We find that the amended judgment assessed the proper amount of interest owed to the Kloesels; the additional $269,711.50 sought by the Kloesels would have constituted an impermissible recovery, if obtained. We thus overrule the Kloesels' first issue.

## B. Attorney's Fees

---

[96] *See Benjamin Franklin Sav. Ass'n v. Kotrla*, 751 S.W.2d 218, 224 (Tex. App.–Houston [14th Dist.] 1988, no writ) (holding that appellee's cross-appeal issue—contending that the trial court erred in failing to award prejudgment interest—was preserved by appellee's motion for entry of judgment and proposed judgment which contained award of prejudgment interest).

[97] 569 S.W.2d 480, 488-89 (Tex. 1978).

[98] *Id.*

[99] The *Simpson* and *Laird* judgments each bore interest at a compounded annual rate of 10%.

43

The trial court's initial judgment awarded the Kloesels $150,000 in attorney's fees through the trial of this case, $50,000 if there is an appeal to this Court, and $25,000 if there is an appeal to the Texas Supreme Court by INT. This award was omitted, however, from the trial court's amended judgment. The Kloesels' second issue requests this Court to reinstate the award. While the Kloesels' brief contends that the award should be reinstated because the award was not barred by the Kloesels' assignment of claims to the Simpsons, it does not contend that the trial court erred in striking the jury's findings of misrepresentation and unconscionable conduct on the part of INT. Because the Kloesels have failed to argue that the trial court erred in striking these findings, we overrule the Kloesels' remaining issue.

## VI. Conclusion

We affirm the judgment of the trial court.

_____
LINDA REYNA YAÑEZ,
Justice

Opinion delivered and filed this
the 3rd day of April, 2008.

44