

# NUMBER 13-12-00224-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

CITY OF BROWNSVILLE, TEXAS,                                              Appellant,

v.

MARCO LONGORIA AND THE BROWNSVILLE
FIRE FIGHTERS' ASSOCIATION,                                             Appellees.

### On appeal from the 445th District Court
### of Cameron County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Garza
Memorandum Opinion by Justice Rodriguez**

In its 2008–2009 fiscal year, appellant, the City of Brownsville, Texas, entered into

a negotiated settlement with the members of its police officers' union, the Brownsville

Police Officers Association (BPOA), which resulted in the dismissal of a lawsuit won in

the trial court by BPOA. The settlement gave the police officers a bonus and pay increase in exchange for dismissal of the lawsuit and certain concessions in the collective bargaining agreement (CBA) that was being concurrently negotiated.

Citing a "me too" provision in their 2007 CBA with the City, appellees Marco Longoria and the Brownsville Fire Fighters' Association (collectively, BFFA) brought suit against the City. Under the "me too" provision, when the City "voluntarily negotiate[d] an across the board wage increase or new fringe benefit to all the members of any FLSA [Fair Labor Standards Act] non-exempt group," fire department personnel were entitled to a corresponding wage increase or new benefit if the increase or benefit given to the other employee group "exceed[ed] that granted to the fire department personnel for the fiscal year in question." BFFA argued that the settlement with the police officers was such an increase and that fire department personnel were therefore entitled to a corresponding wage increase for the 2008–2009 fiscal year. The case was tried to the bench, and the trial court rendered judgment in favor of BFFA, filing extensive findings of fact and conclusions of law.

By two issues on appeal, the City contests two elements of the "me too" provision, arguing that, as a matter of law and due to insufficient evidence the trial court erred in concluding that the lawsuit settlement with the police amounted to "voluntary negotiations" and that the pay increases to the police were "across the board." By its final issue, the City challenges the fundamental basis of BFFA's lawsuit, arguing that it is a circuitous use of the "me too" provision because the BPOA suit was itself brought pursuant to a "me too" clause in the police officers' contract. For the reasons set out

2

below, we affirm the judgment of the trial court.

## I. The "Me Too" Clause

By two issues, the City challenges the trial court's construction of the "me too" clause in BFFA's 2007 CBA and the evidence supporting that determination.

### A. Applicable Law

> In construing a contract, we must ascertain and give effect to the parties' intentions as expressed in the document. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003); *Lopez v. Muñoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000). We consider the entire writing and attempt to harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement. *Webster*, 128 S.W.3d at 229. We construe contracts "from a utilitarian standpoint bearing in mind the particular business activity sought to be served" and "will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive." *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987).

*Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 311–12 (Tex. 2005). Contract terms are given their plain, ordinary, and generally accepted meaning unless the instrument shows the parties used them in a technical or different sense. *Dynegy Midstream Servs., L.P. v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009).

> If, after the pertinent rules of construction are applied, the contract can be given a definite or certain legal meaning, it is unambiguous and we construe it as a matter of law. *Webster*, 128 S.W.3d at 229. On the other hand, a contract is ambiguous if it is susceptible to more than one reasonable interpretation. *Id.*

*Frost Nat'l Bank*, 165 S.W.3d at 312. "A contract is not ambiguous simply because the parties disagree over its meaning." *Dynegy Midstream Servs., L.P.*, 294 S.W.3d at 168.

### B. Standard of Review

A trial court's findings of fact are reviewed for sufficiency of the evidence; we will

3

treat the court's findings in the same manner as a jury's verdict. *Cont'l Coffee Prods., Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996). Although findings of fact are not conclusive when, as in this case, a complete reporter's record appears in the record, "unchallenged findings of fact are binding on the appellate court unless the contrary is established as a matter of law, or if there is no evidence to support the finding." *City of Corpus Christi v. Taylor*, 126 S.W.3d 712, 717 (Tex. App.—Corpus Christi 2004, pet. withdrawn).

When challenging the legal sufficiency of the evidence, the appellant must demonstrate on appeal that there is no evidence to support the adverse finding. *Ins. Network of Tex. v. Kloesel*, 266 S.W.3d 456, 469–70 (Tex. App.—Corpus Christi 2008, pet. denied). The appellate court will consider all evidence in the record in a light most favorable to the verdict, crediting favorable evidence if a reasonable fact finder could and disregarding contrary evidence unless a reasonable fact finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). The evidence is legally insufficient when:

> (a) there is a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of a vital fact.

*Id.* at 810. No more than a scintilla of evidence exists when the evidence is "so weak as to do no more than create a mere surmise or suspicion" that the fact exists. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (citation omitted).

When the appellant challenges the factual sufficiency of an adverse finding on which the other party had the burden of proof, as is the case here, the appellant must

4

demonstrate that there is insufficient evidence to support the adverse finding. *Tex. Prop. & Cas. Guar. Ass'n v. Nat'l Am. Ins. Co.*, 208 S.W.3d 523, 542 (Tex. App.—Austin 2006, pet. denied). We will consider, weigh, and examine all of the evidence in the record, both in support of and contrary to the finding. *Kloesel*, 266 S.W.3d at 470. We will set aside the trial court's finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Id.*

We review a trial court's conclusions of law de novo. *Villagomez v. Rockwood Specialties, Inc.*, 210 S.W.3d 720, 727 (Tex. App.—Corpus Christi 2006, pet. denied). We will uphold conclusions of law if the judgment can be sustained on any legal theory supported by the evidence. *City of Houston v. Cotton*, 171 S.W.3d 541, 546 (Tex. App.—Houston [14th Dist.] 2005, pet. denied). Thus, incorrect conclusions of law do not require reversal if the controlling findings of fact support the judgment under a correct legal theory. *Id.*

## C.   Findings of Fact

The following findings of fact are relevant to our analysis, are not contested by the City, and were supported by the evidence at trial, *see Taylor*, 126 S.W.3d at 717:

> 8.   In June 2006, the City and the BPOA reached agreement on a new [CBA] for police officers. The new agreement, . . . (the "2006 PO CBA"), was executed by the City and the BPOA on June 8, 2006.
>
> 9.   As reflected in the 2006 PO CBA . . . , Brownsville police officers received percentage base pay raises, ranging from 3.6% on the low end to 25% at the high end, except for entry level positions. These pay raises were effective June 2006. However, the 2006 PO CBA did not provide for raises to base pay in FY [fiscal year] 2006–07 or FY 2007–08.
>
> 10.   Under the 2006 PO CBA, police officers also received "Supplemental Pay" as follows:

5

a. $800 paid as a one-time payment in June 2006;

b. $1200 amortized over the pay periods of FY 2006–07; and

c. $2400 amortized over the pay periods of FY 2007–08.

11. The 2006 PO CBA had a so-called "me too" provision. That provision . . . stated:

> Section 1. If the City voluntarily negotiates an across-the-board wage increase or new fringe benefit to all members of the FLSA non-exempt civilian workforce or all firefighters which exceed that granted the police officers for the year in question, the bargaining unit shall be granted the same improvement.

12. Brownsville firefighters did not receive a base pay increase or supplemental pay in FY 2005–06.

13. In April 2007, the City and the BFFA reached agreement on a new [CBA] for fire fighters. The new agreement, . . . (the "2007 FF CBA"), was executed by the City and BPOA on April 12, 2007.

14. As reflected in the 2007 FF CBA . . . , Brownsville fire fighters received two percentage raises to base pay ranging from 0.25% on the low end to 7.5% at the high end, except for the probationary entry level position. The first raise was effective on April 16, 2007. The second raise was effective on October 1, 2007.

15. Under the 2007 FF CBA, Brownsville fire fighters also received "Supplemental Pay" as follows:

> a. $3600 signing bonus due within 30 days of execution of the CBA;
>
> b. $1200 amortized over the remaining pay periods of FY 2006–07; and
>
> c. $2400 amortized over the pay periods of FY 2007–08.

16. The 2007 FF CBA, like the 2006 PO CBA, has a so-called "me too" provision. That provision . . . states in pertinent part:

> Section 1. If the City voluntary negotiates an across-the-board wage increase or new fringe benefit to all members of any FLSA non-exempt group which exceed that granted to the fire department

6

personnel for the fiscal year in question, the fire bargaining unit shall be granted the same improvement.

.  .  .  .

17.    In 2007, the BPOA and the City commenced negotiations for a new collective bargaining agreement to replace the 2006 PO CBA.    Those negotiations continued into April 2009 without resolution.

18.    On June 11, 2007, the BPOA filed a lawsuit against the City, claiming that the City had violated the "me too" provision in the 2006 PO CBA by granting fire fighters more in supplemental pay than had been received by police officers, and by granting the fire fighters base pay raises in FY 2006–07 and 2007–08 that had not been received by Brownsville police officers. . . .    The BPOA lawsuit will hereinafter be referred to as the "Police Me Too Lawsuit."

19.    The [trial court] granted relief to the BPOA in the Police Me Too Lawsuit by final judgment signed on July 16, 2008 . . . .

20.    Under the terms of the final judgment, each Brownsville police officer . . . was to be paid a lump sum payment in the amount of $2800.00 by August 15, 2008.

21.    Under the terms of the final judgment, the [trial court] found that the following police officer and fire fighter positions were comparable for pay purposes:

| Police Department | Fire Department |
|---|---|
| Patrol Officer I | Firefighter B |
| Patrol Officers II, III & IV | Firefighter A |
| Detective/Investigator | Fire Truck Operator |
| Sergeant | Lieutenant |
| Lieutenant | Captain |
| Commander | Assistant Chief |

At the trial of [the BFFA lawsuit], the City stipulated that the rank comparability between Brownsville police officers and fire fighters had been judicially determined in the Police Me Too Lawsuit.

22.    Under the terms of the final judgment [in the Police Me Too Lawsuit], the [trial court] found that the Brownsville police officers should be provided the same base pay increases that had been provided to the Brownsville fire fighters in FY 2006–07 and 2007–08, and awarded base pay raises to the

7

police officers in the various ranks according to the raises provided to fire fighters in the comparable ranks. The final judgment ordered that these pay raises be put into place by August 15, 2008.

23. Under the terms of the final judgment, the [trial court] ordered the City to pay the BPOA's court costs.

24. The City appealed the final judgment to the Thirteenth Court of Appeals of Texas, arguing inter alia that the [trial court] erred in its findings . . . because the pay raises provided to firefighters under the 2007 FF CBA were not "across-the-board" pay raises and, because the firefighter pay raises were "catch up" pay raises, they did not constitute pay raises to which the CBA's "me too" provision applied.

25. Oral argument on the [C]ity's appeal was held . . . on March 25, 2009.

26. Shortly after March 25, 2009, Brownsville City Attorney Mark Sossi approached BPOA negotiators . . . concerning a possible settlement of both the ongoing police collective bargaining negotiations and the Police Me Too Lawsuit. Over the course of approximately three weeks, Mr. Sossi negotiated directly with the BPOA team to attempt resolution of both matters. . . .

27. On or about April 16, 2009, Mr. Sossi and the BPOA negotiators reached an agreement to resolve both the Police Me Too Lawsuit and the collective bargaining negotiations.

28. The BPOA and the City entered into a "Comprehensive Settlement Agreement and Satisfaction of Judgment" (the "settlement agreement") in resolution of the Police Me Too Lawsuit. . . . The settlement agreement was signed by the BPOA representatives and attorneys on April 16, 2009. The settlement agreement was signed by the Brownsville City Manager on April 22, 2009.

29. Under the terms of the settlement agreement, the City agreed to pay Brownsville police officers (except probationary police officers and Commanders) [still] employed . . . on October 1, 2008, the amount of $2800.00 on or before June 21, 2009.

30. Under the terms of the settlement agreement, the City agreed to implement the percentage pay raises set forth in the final judgment, commencing the first full pay period after October 1, 2008. . . .

31. Under the terms of the settlement agreement, the City provided the

BPOA and Brownsville police officers with less than was called for by the final judgment. Specifically, the City's obligations were reduced under the settlement agreement in at least the following regards:

(a) the City was released from its obligation to pay the BPOA's court costs;

(b) the City's obligation to pay police officers a lump sum of $2800 was delayed . . . ;

(c) the City's obligation to implement the percentage increases to base pay was delayed . . . ;

(d) the City was released from its obligation to pay post-judgment interest.

32. City Attorney Mark Sossi . . . knew and understood at the time of the settlement agreement that the BPOA was settling with the City for less than was required by the final judgment. However, the BPOA negotiators nonetheless agreed to the settlement because of the benefits provided in both the settlement agreement and the simultaneous settlement of the BPOA contract negotiations.

. . . .

34. On April 21, 2009, the BPOA and the City executed a new [CBA], . . . (the "2009 PO CBA"), a six year agreement running through FY 2013–14, and continuing thereafter until replaced by a successor agreement.

35. Under the terms of the 2009 PO CBA, the BPOA agreed to the following concessions it had not previously agreed to in negotiations, including at least the following:

(a) no pay raises for [FY]s 2008–09, 2009–10 and 2010–11; [and]

(b) lower health insurance benefits; . . .

36. . . . The city manager did not execute the settlement agreement on behalf of the city until after the BPOA's representatives had executed the 2009 PO CBA.

37. On May 14, 2009, acting in accordance with the City's motion to withdraw the appeal, the Thirteenth Court of Appeals dismissed the City's appeal of the final judgment, taxing costs against the party incurring the same.

38. The BFAA and the City commenced negotiation of a successor agreement to the 2007 CBA in 2008. At the time of trial, the BFFA and the

9

City had not been successful in reaching a successor agreement.

39. The Brownsville fire fighters did not receive a lump sum payment of $2800 in FY 2008–09 as did the Brownsville police officers. The Brownsville fire fighters did not receive any raise to base pay in FY 2008–09 as did their comparators among the Brownsville police officers.

## D. "Voluntarily Negotiates"

By its first issue, the City contests the following conclusion of law by the trial court:

The "Comprehensive Settlement Agreement and Satisfaction of Judgment" entered into between the BPOA and the City on April 22, 2009, was a voluntary agreement, rather than a simple satisfaction of the final judgment in the Police Me Too Lawsuit. Under the terms of the settlement agreement, the City paid less than was required to satisfy the judgment of the 107th District Court and received valuable additional consideration from the BPOA in exchange for its agreement to make the agreed upon payments.

The City argues that the trial court erred in its foregoing conclusion because the evidence is undisputed that the City would not have entered the settlement agreement had it not been compelled to do so by the final judgment in the Police Me Too Lawsuit. As a result, the City argues, the resolution of the police lawsuit, as a matter of law, could not be construed as a "voluntary negotiation" under the terms of the BFFA's "me too" clause, and as such, the trial court erred in concluding that the clause had been triggered.[1] We disagree—the evidence at trial showed that the settlement was part of the broader talks occurring as the City and BPOA negotiated their next CBA, and these negotiations are properly characterized as voluntary.

The City points to testimony by City Attorney Mark Sossi, in which he stated that the City "paid [the settlement agreement] under compulsion . . . of a hostile adverse

---

[1] Both parties assert—and we agree—that the term "voluntarily negotiates" is unambiguous.

10

judgment."  Sossi testified:

> I think we need to be real careful what we're talking about here.  Am I voluntarily entering into a settlement agreement, yes, I am, but am I — but is it truly voluntary in the sense that would I have done that but for the existence of a judgment, clearly no, I wouldn't have.  I mean — you know, the point is once you have the judgment, and that is — the judgment is a court order that's compelling you as an individual to pay a certain sum of money, you're not in a voluntary situation.  You're negotiating with a gun to your head, so you're satisfying the judgment because you have to.  Whether you pay 10 cents on the dollar or 50 cents on the dollar or 90 cents on the dollar, you're paying that judgment because there's a Court order that's compelling you to pay it.

The City argues that the foregoing was "unrebutted and undisputed" by BFFA at trial.

It is undisputed that, during the pendency of the Police Me Too Lawsuit, the City and BPOA were also actively involved in negotiations for a new CBA.  The trial court also found, and the City does not dispute, that the CBA terms offered by the City during the lawsuit settlement negotiations were less-favorable than the terms in the 2006 PO CBA.  In the new CBA, the police officers would receive no pay raises in fiscal years 2008–09, 2009–10, and 2010–11, and they would receive lower health insurance benefits.  At trial, two representatives from BPOA testified that the City made the union's agreement to these concessions a pre-condition to the City's agreement to settle the lawsuit.  BPOA also admitted as evidence an email from a City attorney to BPOA representatives that expressly articulated this contingency.  In the email, the City attorney stated:

> I have enclosed a proposed settlement agreement and acknowledgement of satisfaction of judgment as authorized by the City Commission contingent upon the execution of a CBA proposed by the Commission.  The BPOA has rejected the City's proposal and has countered and we are currently discussing the counter, so the settlement would be contingent on the mutual acceptance of the new terms.  [Representatives of BPOA] are currently reviewing the language of the settlement agreement.  Please let them or me know about any of your comments on the language.

11

Finally, the evidence at trial showed—and, again, the City does not dispute—that BPOA settled for less than it would have been entitled to had the judgment against the City been strictly enforced. In the settlement agreement, the City was released from its obligation to pay the BPOA's court costs; the City's obligation to pay police officers a lump sum of $2800 was delayed; the City's obligation to implement the percentage increases to base pay was delayed; and the City was released from its obligation to pay post-judgment interest.

From the foregoing, we cannot conclude that there was no evidence of voluntariness. The evidence showed that the settlement agreement was part of the broader negotiations occurring between the City and BPOA. Both parties made concessions. And crucially, there was evidence that the City considered the settlement of the lawsuit part and parcel of its negotiations for a new CBA. This evidence was more than a scintilla and was not so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *See City of Keller*, 168 S.W.3d at 810; *see also Kloesel*, 266 S.W.3d at 470. Based on the evidence before it, we cannot say that the trial court erred in concluding that the City's participation in the settlement agreement was voluntary. See *Villagomez*, 210 S.W.3d at 727; *Cotton*, 171 S.W.3d at 546. We overrule the City's first issue.[2]

---

[2] The City cites two lines of cases in support of its position that acting in the context of a judgment can never be voluntary. First, it cites *In re J.K.H. & B.D.M.*, which is a parental termination case in which the trial court determined that a father who had left his children in the care of their mother pursuant to a court order had not "voluntarily" left the children. No. 06-09-00035-CV, 2009 WL 2948575, at *3 (Tex. App.—Texarkana Sept. 16, 2009, no pet.) (mem. op.). Second, the City cites two cases in which the Texas Supreme Court held that payment of a judgment does not trigger the "voluntary payment rule"; this common-law rule provides that a party, with full knowledge of the facts and which is not acting under fraud or compulsion, who voluntarily pays money on a claim cannot later recover the money when the party

## E. "Across-the-Board"

By its second issue, the City challenges the trial court's implicit conclusion that the pay increases provided to the police officers in the settlement agreement were "across-the-board" under the terms of the "me too" provision. The City argues that: (1) as a matter of law, the pay raises were not "across-the-board" because the percentage-values of the pay raises varied across rank; (2) there is no evidence that the police ranks of "Detective/Investigator" or "Commander" received a pay increase, which prevented the raise from being "across-the-board" and meant that the raise provided to fire truck operators and assistant fire chiefs had no comparator in the BPOA pay scale; and (3) under Texas Rules of Civil Procedure 297 and 299, the trial court's refusal to issue findings of fact on the across-the-board issue, despite the City's affirmative request for such findings, means there is no basis for the court's ruling that the "me too" provision

discovers it was mistaken about the law supposedly creating its liability. *See Miga v. Jensen*, 299 S.W.3d 98, 104 (Tex. 2009); *Highland Church of Christ v. Powell*, 640 S.W.2d 235, 237 (Tex. 1982). The supreme court reasoned that a party against which a judgment has been taken does not forfeit its right to eventual return of the money merely because it paid the judgment to avoid the penalties and interest accruing during an appeal.

This case is clearly distinguishable from both lines of cases cited by the City, and we are therefore not persuaded by the City's arguments. Unlike the father in *In re J.K.H.*, there was no court order compelling the City to negotiate a settlement. During the pendency of the City's appeal of the trial court's final judgment, the parties voluntarily entered negotiations to settle the case before disposition by the appellate court. And, as outlined above, the evidence showed that the settlement negotiations were part of the broader negotiations over a new CBA between the City and BPOA. In fact, no order or judgment was ever executed against the City as the lawsuit was resolved by the settlement agreement.

Likewise, we cannot conclude that *Miga* or *Highland Church of Christ* are apposite to the facts of this case. Both cases concern a dispute between a judgment debtor and creditor after the debtor's successful appeal of the adverse judgment. In both cases, the creditor defended against the debtor's attempt to recover the amount it paid by citing the "voluntary payment rule"; the supreme court rejected this argument, holding that the rule does not preclude a judgment debtor seeking restitution where it has paid a judgment and expressed intent to appeal the judgment when appellate relief is attainable. Here, the City's decision to negotiate a settlement agreement, which it characterizes as compelled and not voluntary, occurred before the resolution of its appeal. Moreover, as explained above, the circumstances of the negotiations in this case sufficiently vitiated the compulsive nature of the judgment such that the City's decision to enter the settlement agreement cannot fairly be described as involuntary.

13

was triggered.

### 1. Meaning of "Across-the-Board"

As with the "voluntarily negotiates" term, both parties contend, and again, we agree, that the term "across-the-board" is not ambiguous; the parties merely advance different interpretations of the term. *See Dynegy Midstream Servs., L.P.*, 294 S.W.3d at 168. The City contends that an "across-the-board" pay raise would have increased every rank's salary by the same percentage. BFFA contends that the pay raises were "across-the-board" because every rank—and, in effect, every member of the BPOA bargaining unit—received a raise. We agree with BFFA.

Because the 2007 FF CBA does not require otherwise, we accord the terms of the contract their plain and ordinary meaning. *See id.* The "me too" clause provides:

> If the City voluntary negotiates an across-the-board wage increase or new fringe benefit to all members of any FLSA non-exempt group which exceed that granted to the fire department personnel for the fiscal year in question, the fire bargaining unit shall be granted the same improvement.

Black's Law Dictionary defines "across-the-board" as "[a]pplying to all classes, categories, or groups." BLACK'S LAW DICTIONARY 27 (9th ed. 2009). Similarly, Merriam-Webster defines "across-the-board" as "affecting everyone or everything in a group." MERRIAM-WEBSTER DICTIONARY, http://www.merriam-webster.com/dictionary/across-the-board (last visited Feb. 28, 2014). Because the provision includes no additional language concerning the rate of the wage increase, we cannot conclude that the term "across-the-board" has a more specific meaning than the well-accepted, general meaning cited above. In other words, looking only to the plain and ordinary meaning of the terms, we conclude that "across-the-board" refers merely to a wage increase or new benefit

14

accruing to all the members of the particular FLSA non-exempt group at issue. It does not also require the increase to be of a uniform rate. To adhere to such a construction would be unreasonable and oppressive, *see Frost Nat'l Bank*, 165 S.W.3d at 12 (citation omitted), and we are therefore not persuaded by the City's argument in this regard.

### 2. Evidence of Comparator Rank Raises

The City also argues that the wage increases in the settlement agreement were not "across-the-board" because there is no evidence that the police ranks of "Detective/Investigator" or "Commander" received pay increases. As a result, the City argues, the raises provided to Fire Truck Operators and Assistant Fire Chiefs had no comparator in the BPOA pay scale and were awarded in error.

#### i. Detective/Investigator

As the City posits, it is true that the category of Detective/Investigator received no pay increase in the settlement agreement. However, it is also true that Detective/Investigator is not an official rank established in either the 2006 or 2009 PO CBAs; the only ranks established by the CBAs are "Probationary," "Patrol I[-IV]," "Sergeants," "Lieutenant," and "Commander." Detective/Investigator is an assignment given to officers of various rank for which they receive an additional $1 per hour. This is clear from the evidence and not disputed by the City.

In the judgment in the Police Me Too Lawsuit, the trial court found that the positions of Detective/Investigator and Fire Truck Operator were comparable for pay purposes. The City contends that this finding judicially established the rank of Detective/Investigator. We disagree. This finding was merely used to determine the amount of the pay increase

15

for each rank in the Police Me Too Lawsuit so that the firefighters received the "same improvement," as required by the "me too" language. In other words, although not clearly phrased, this finding merely established that the responsibilities of those two positions were comparable; it did not judicially establish a Detective/Investigator rank.

In fact, it is clear from the evidence and not disputed by the City that the judgment in the Police Me Too Lawsuit awarded pay raises to all FLSA non-exempt police personnel: a 0.5% base pay increase for Patrol I officers; a 15% base pay increase for Patrol II-IV officers; a 8.6% base pay increase for Sergeants; and a 12.4% base pay increase for Lieutenants. That there was not a pay increase for Detective/Investigator does not mean the pay increases were not "across-the-board"; it merely means that there was no such rank to which a pay increase could be given.

### ii. Commander

Likewise, that there was not a pay increase for the Commander rank does not mean the pay increases were not "across-the-board." With regard to police Commanders, it is true, as posited by the City, that no definite increase was given; the increase provided to Commanders in the settlement agreement, if any, was at the Police Chief's discretion. Even assuming this means Commanders received no pay increase, that fact is irrelevant. Under the 2006 and 2009 PO CBAs, the Commander rank is directly below the Police Chief. The CBAs provide that Commanders serve "at the pleasure of the Police Chief" and that the Chief has "sole unfettered discretion" over Commanders' "wages, hours, benefits and other conditions of employment." Thus, the CBAs remove Commanders' pay and other conditions of employment from the realm of

16

negotiation. Only the Chief may set and alter Commanders' conditions of employment, and for this reason, pay increases for Commanders were not even on the table at the negotiations for the settlement agreement that resolved the Police Me Too Lawsuit. In short, the absence of a pay increase for Commanders in the settlement agreement has no bearing on whether the included pay increases were across-the-board.

### iii. Wage Increases for Fire Truck Operators and Assistant Fire Chiefs

Finally, the City argues that because there were no pay increases for Detective/Investigators or Commanders, there was no basis under the "me too" provision for giving pay increases to Fire Truck Operators or Assistant Fire Chiefs, the fire department ranks found comparable to Detectives and Commanders. But looking only to the plain meaning of the terms therein, we do not believe the "me too" provision requires the strict rank-to-rank comparability implied by this argument and borne out in the trial court's findings and conclusions. *See Frost Nat'l Bank*, 165 S.W.3d at 311–12; *see also Dynegy Midstream Servs., L.P.*, 294 S.W.3d at 168. Rather, the "me too" provision in the 2007 FF CBA requires only that when "any FLSA non-exempt group" receives an "across-the-board wage increase or new fringe benefit," the "fire bargaining unit shall be granted the same improvement." No further qualification or limitation is provided. Therefore, here, having concluded that all FLSA non-exempt police personnel received a raise pursuant to the settlement agreement and Police Me Too Lawsuit judgment, the entire "fire bargaining unit" was entitled to the "same improvement." The comparability charts utilized by the trial court served only to aid in determining the amount of the pay increase accruing to each rank. That there was difficulty in assessing the

17

appropriate value of pay increases is belied by the trial court's inclusion of the Detective/Investigator assignment in the comparison chart. As discussed above, Detective/Investigator is, undisputedly, not even a rank; but the trial court was clearly striving to adhere to the notion that strict comparability was a requirement, which was arguably an erroneous construction of the terms of the "me too" provision. Although the provision required the firefighters to receive the "same improvement," it did not require a strict rank-to-rank comparability to comply with that term. To achieve this strict comparability would require an unusual level of employment policy coordination between the police department and fire department, a coordination that is reflected nowhere in the evidence. In the end, to interpret the "same improvement" term as such would exclude two ranks from the pay increase based on nothing more than an artificial comparability scale, and this would be an unreasonable and oppressive construction of the language in the "me too" provision. *See Frost Nat'l Bank*, 165 S.W.3d at 312 (citation omitted).

Because the controlling facts support the foregoing correct construction of the "me too" provision, we are not persuaded by the City's argument to the contrary. *See Cotton*, 171 S.W.3d at 546.

### 3. Findings of Fact

The City's final argument is that the trial court's failure to make a specific finding of fact on the "across-the-board" issue precluded the judgment in favor of BFFA. Specifically, the City argues that because it requested that the trial court make a finding on the across-the-board term and the court failed to do so, that failure amounted to a refusal and, therefore, we may not presume any findings in that regard on appeal. *See*

18

TEX. R. CIV. P. 299; *see also Davey v. Shaw*, 225 S.W.3d 843, 857 (Tex. App.—Dallas 2007, no pet.) (quoting *Boy Scouts of Am. v. Responsive Terminal Sys., Inc.*, 790 S.W.2d 738, 742 (Tex. App.—Dallas 1990, writ denied); citing *Vickery v. Comm'n for Lawyer Discipline*, 5 S.W.3d 241, 252 (Tex. App.—Houston [14th Dist.] 1999, pet denied) (holding that the rule of omitted findings, which allows presumed findings on unrequested and omitted findings, does not permit a finding to be presumed when such finding was requested and refused by trial judge)). Without an across-the-board finding, the City argues, there is no basis for the trial court's conclusion that the "me too" provision was triggered.

Although the trial court's relevant findings of fact in this case do not use the exact words "across-the-board," the findings do encompass the facts necessary to support its conclusion that the police raises met that requirement. In particular, findings 21, 22, and 30 show that under the settlement agreement, pay raises were awarded to each FLSA non-exempt police officer. We need not presume any facts as all the essential facts for resolution of the across-the-board issue are found in the foregoing findings. The City's argument to the contrary is without merit.

### 4. Summary

Having addressed each of the City's arguments, we conclude that sufficient evidence supported the trial court's determination that the settlement agreement's pay raises were "across-the-board" under the terms of the "me too" provision. The trial court therefore did not err in concluding, on this basis, that the provision triggered a raise for fire personnel, as well. The City's second issue is overruled.

## II.  The Nature of BFFA's Lawsuit

By its final issue, the City makes the following argument:

> Any reasonable interpretation of the [2007 FF CBA] precludes allowing it to rely on payment of a judgment, which brought parity to the police officers up to the level of the firemen's compensation, as a basis for [BFFA] to seek "parity" or "me too" additional compensation.  If the [BPOA] achieved parity to the [2007 FF CBA] in the [Police Me Too Lawsuit] judgment, it simply is impossible for payment of that "catch up" amount to be a basis to complain that the police officer's [sic] were receiving more than the [BFFA] members.  The parties' contractual intent could not contemplate such a ridiculous notion.  The parity clause was clearly intended to "protect[ the] early-settling union[] from looking foolish" if the City gave more favorable terms to another [u]nion.  [*See Wilmington Firefighters Ass'n, Local 1590 v. City of Wilmington*, No. CIV. A. 19035, 2002 WL 418032, at *1 (Del Ch. March 12, 2002).]  It was intended to have the City defend a series of circuitous arguments by the two unions in which each union claimed additional benefits were owed to achieve parity with the other union's benefits package even after a court had entered a judgment awarding parity.  Simply stated[,] if parity was achieved by the first judgment, then it is ridiculous to assert that additional benefits in excess of the benefits achieved by the [BFFA] were received by the [BPOA].

The City argues that, considering the parties' understanding of the term at the time the contract was made, allowing this "circuitous" use of the "me too" provisions leads to absurd results.  *See Citizens Nat'l Bank in Abilene v. Tex. & P. Ry. Co.*, 150 S.W.2d 1003, 1007 (Tex. 1941).

As we have done above, to determine the parties' intent, we look to the plain language of the "me too" provision and attempt to harmonize it with the remainder of the 2007 FF CBA.  *See Frost Nat'l Bank*, 165 S.W.3d at 311–12.  The language of that provision, and the CBA as a whole, give no indication that the parties wished to impose the City's proposed limitation on the application of the "me too" provision.  The "me too" provision in the 2007 FF CBA requires that if any FLSA non-exempt group receives a

20

wage increase or new benefit that exceeds an increase or benefit granted to the fire bargaining unit "*for the fiscal year in question*," the fire bargaining unit is entitled to the same increase. (Emphasis added.) Whether the fire bargaining unit is entitled to an increase under the "me too" provision is not determined by the origin of, or circumstances surrounding, the increase to the FLSA non-exempt group. In other words, it is irrelevant that BPOA's increase originated in its efforts to achieve parity with the firefighters. Under the plain terms of the "me too" provision, whether the fire bargaining unit was entitled to an increase is simply determined by whether the other group received a benefit that exceeded the benefit given to the firefighters for *that fiscal year*. And in this case, it is undisputed that the firefighters had received no raise in the 2008-09 fiscal year, the year in which the City and BPOA reached their agreement. The increase provided to the police officers in the settlement agreement clearly triggered the fire bargaining units' "me too" rights under the 2007 FF CBA. The City's contrary interpretation adds a requirement to the "me too" provision that is not supported by the plain terms of the provision.[3]

---

[3] The City heavily emphasizes a letter sent by the attorney who both represented BPOA during the Police Me Too Lawsuit and advised BFFA representatives during their 2008-09 negotiations for a new CBA. In that letter, the attorney informed the service director of the Texas State Association of Firefighters that, in light of the pay increases provided to the BPOA in the settlement agreement, he believed the BFFA had a valid "me too" claim to assert against the City under the terms of the 2007 FF CBA. The City seems to imply some impropriety in this communication, asserting that counsel "began 'contriving'" a claim for the firefighters during the pendency of the Police Me Too Lawsuit. While we do not necessarily agree that this letter shows such a plot, we nonetheless do not reach this assertion, because it is evidence outside the four corners of the contract. And because the contract at issue is not ambiguous, and because the City has made no other claims regarding fraud or the like, we cannot consider parol evidence. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) ("Only where a contract is first determined to be ambiguous may the courts . . . admit extraneous evidence to determine the true meaning of the instrument."); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) ("If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law."); *Miller v. Gray*, 149 S.W.2d 582, 583 (Tex. 1941) ("[E]vidence of custom is admissible only to explain an ambiguous contract or to add to it an element not in contravention of its terms; but such evidence is never admissible to contradict the plain unambiguous covenants and agreements expressed in the contract itself.").

21

In short, the City's argument that BFFA's "me too" claim is precluded by the unique nature of the proceedings, *i.e.*, the "circuitous" use of the "me too" provisions in the unions' contracts, is without merit. The City's third issue is overruled.

### III. Conclusion

We affirm the judgment of the trial court.

NELDA V. RODRIGUEZ
Justice

Delivered and filed the
3rd day of April, 2014.